[L.A. No. 31199. Feb. 8, 1982.]

MARINA POINT, LTD., Plaintiff and Respondent, v.
STEPHEN WOLFSON et al., Defendants and Appellants.

**Counsel**

Eugene C. Gratz, Noble, Gratz & Wolfson, Goller, Gillin & Menes, Lawrence C. Nobel, Josseline Charas, Kathleen Doyle and Màrtha Warriner for Defendants and Appellants.

W. Kenneth Rice, Steven Belasco, Mary K. Gillespie, Stephen R. Nielson, Robert M. Myers, Michael E. Wine, Eugene Roy Salmonsen, Harry M. Snyder, Susan Bartlett Foote, Carl K. Oshiro, Luana Martilla, Sharon Mosley, David A. Garcia, Steven C. Owyang, Joanne A. Lewis, Beverly S. Tucker, Ruby S. Udell, Eric W. Wright, Sidney M. Wolinsky, Richard Friedman, Katherine Wolff, David E. Frank and Fred Okrand as Amici Curiae on behalf of Defendants and Appellants.

Richard F. Hamlin for Plaintiff and Respondent.

Dennis B. Kavanagh as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**TOBRINER, J.***—In this case we must determine whether, under California law, an owner of an apartment complex may lawfully refuse to rent any of its apartments to a family solely because the family includes a minor child. In the landlord's action to eject the family, the municipal court found, inter alia, that "[c]hildren are rowdier, noisier, more mischievous and more boisterous than adults," and upheld the landlord's policy of excluding all families with minor children. The tenants now appeal from the judgment in favor of the landlord, contending that the exclusionary policy violates their statutory rights under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the California Fair Housing Law (Health & Saf. Code, § 35700 et seq., now Gov. Code, § 12955) and, in addition, impermissibly infringes upon their state and federal constitutional rights of familial privacy (U.S. Const., 9th & 14th Amends., Cal. Const., art. I, § 1) and equal protection of the law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)

For the reasons discussed below, we have concluded that the landlord's broad, class-based exclusionary practice violates the Unruh Civil Rights Act (hereafter Unruh Act or act); in light of this conclusion, we have no occasion in this case to address any of the tenants' more sweeping and far-reaching constitutional contentions. As we shall explain, the municipal court, in finding the challenged practice compatible with the Unruh Act, proceeded from the erroneous premise that under that act "[n]ot every class . . . is protected from exclusion," but rather that "[i]t is only such class . . . that is protected as is set forth in the [s]tatutes or who come under the [s]tatutes by judicial determination." Finding that "[t]here is no decision to include children, parents with children, or families with children, as a protected class by the wording of the [s]tatutes themselves or by judicial determination," the court concluded that the challenged practice fell outside the scope of the act.

As we shall point out, the municipal court's approach conflicts with the interpretation of the Unruh Act unanimously adopted by this court

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

a decade ago in *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992]. In *Cox*, after reviewing the origin, legislative evolution and prior judicial decisions construing the Unruh Act and its predecessors, our court concluded that the "identification of particular bases of discrimination—color, race, religion, ancestry and national origin—[in the current version of the act] ... *is illustrative rather than restrictive.*" (Italics added.) (3 Cal.3d at p. 216.) Although we recognized that in recent years the act had been invoked most often "by persons alleging discrimination on racial grounds," we emphasized that the act's "language and its history compel the conclusion that the Legislature intended to prohibit *all* arbitrary discrimination by business establishments." (Italics added.) (*Ibid.*) Thus, contrary to the municipal court's conclusion, the fact that the landlord's exclusionary policy in this case discriminated against children and families with children, rather than a specific racial or religious group or some other classification specifically involved in a prior judicial decision, does not place the exclusionary practice beyond the reach of the Unruh Act.

The landlord maintains, however, that even if the municipal court did err in its analysis of the Unruh Act, we should nevertheless affirm the trial court judgment on the grounds that the exclusionary policy at issue is "reasonable," not "arbitrary," and hence not violative of the Unruh Act. Relying, inter alia, upon the court's finding that "[c]hildren are rowdier, noisier, more mischievous and more boisterous than adults," the landlord claims that it may seek to achieve its legitimate interest in a quiet and peaceful residential atmosphere by excluding *all* minors from its housing accommodations, thus providing its adult tenants with a "child free" environment.

As we shall explain, however, the landlord's argument overlooks the individual nature of the statutory right of equal access to business establishments that is afforded "all persons" by the Unruh Act. Derived from the early common law right of equal access to the services of innkeepers or common carriers, the Unruh Act prohibits business establishments from withholding their services or goods from a broad class of individuals in order to "cleanse" their operations from the alleged characteristics of the members of an excluded class.

As our prior decisions teach, the Unruh Act preserves the traditional broad authority of owners and proprietors of business establishments to adopt reasonable rules regulating the conduct of patrons or tenants; it imposes no inhibitions on an owner's right to exclude any individual

who violates such rules. Under the act, however, an individual who has committed no such misconduct cannot be excluded solely because he falls within a class of persons whom the owner believes is more likely to engage in misconduct than some other group. Whether the exclusionary policy rests on the alleged undesirable propensities of those of a particular race, nationality, occupation, political affiliation, or age, in this context the Unruh Act protects individuals from such arbitrary discrimination.

Accordingly, we conclude that the judgment in favor of the landlord should be reversed.

## 1. *The facts and proceedings below.*

Plaintiff Marina Point, Ltd. (hereafter landlord or Marina Point) is a privately owned apartment complex, which, at the time of trial, consisted of 846 separate apartment units. The apartment complex, located in Marina del Rey, an unincorporated area in the County of Los Angeles, stands on land owned, and leased by the county to Marina Point. The master lease between the county and Marina Point specifically forbids Marina Point from discriminating on the basis of race, religion or national ancestry, but contains no provision with respect to other forms of discrimination.

In January 1974, defendants Stephen and Lois Wolfson signed a one-year lease for an apartment in the Marina Point complex with occupancy to begin on February 1 of that year. Although the printed form lease that the Wolfsons then signed contained a clause which provided that no minors under the age of 18 could reside in the leased premises without the landlord's written permission, Marina Point acknowledges that at that time it followed a policy of renting its apartments to families with children as well as to families without children.

In October 1974, Marina Point altered its rental policy with the objective of ultimately excluding all children from the apartment complex. At that time, well over 60 families with children lived in apartments in the complex, and Marina Point decided that while it would allow the children already there to remain, it would not rent any apartments to new families with children or with pregnant women.

In February 1975, the Wolfsons renewed their lease for a one-year period; the form lease again contained the same clause with respect to

children as had appeared in the initial lease. In September 1975, Lois Wolfson gave birth to a son, Adam, who thereafter resided with his parents in the family apartment in Marina Point. In February 1976, the Wolfsons renewed their lease for another year; although the lease again contained the identical clause as to written consent for children, the Wolfsons apparently did not specifically inform the landlord of Adam's presence, and the lease made no reference to him.

In the fall of 1976, the landlord's manager learned that the Wolfsons had a child living in the apartment; shortly thereafter, the landlord informed them that their lease, due to expire on January 31, 1977, would not be renewed, and that the sole reason for such nonrenewal was Adam's presence on the premises.

After some negotiation between the parties, Marina Point agreed to a three-month extension of the Wolfsons' lease; the new lease agreement, which again contained the same provision as to children, specified that the premises would be occupied by the Wolfsons and their son. Thereafter, upon the Wolfsons' request, the landlord agreed to an additional one-month extension of the lease to May 31, 1977.

When the Wolfsons failed to vacate the premises on May, 31 the landlord commenced the present unlawful detainer action in municipal court. In their answer, the Wolfsons maintained that the landlord's policy of discriminating against families with children violated both statutory constitutional prescriptions, and, as such, did not provide a lawful basis for their eviction. The landlord acknowledges that if its exclusion of the Wolfsons does in fact contravene statutory or constitutional strictures, such illegality would indeed provide a valid defense to the unlawful detainer action. (See, e.g., *S.P. Growers Assn.* v. *Rodriguez* (1976) 17 Cal.3d 719, 724 [131 Cal.Rptr. 761, 552 P.2d 721]; *Schweiger* v. *Superior Court* (1970) 3 Cal.3d 507 [90 Cal.Rptr. 729, 476 P.2d 97]; *Abstract Investment Co.* v. *Hutchinson* (1962) 204 Cal. App.2d 242 [22 Cal.Rptr. 309].)

At trial, the landlord conceded that its nonrenewal of the Wolfsons' lease rested solely on its current general policy of refusing to rent any of its apartments to families with children, but the landlord denied that this policy violated any statutory or constitutional principle. In defense of its exclusionary policy, the landlord's apartment manager testified that the decision to bar families with children rested in part on a number of past instances in which young tenants had engaged in annoying

or potentially dangerous activities, ranging from acts of arson to roller skating and batting practice in the hallways to the attempted solicitation of snacks from the landlord's office staff.

The manager did not indicate, however, what proportion of the tenant children engaged in such activities or what steps, short of the blanket exclusionary policy, the landlord had implemented to deal with the problem, such as promulgating general rules as to permissible and impermissible conduct or excluding from the complex those families whose children repeatedly committed disruptive or destructive acts. Moreover, the landlord introduced no evidence that the Wolfsons' child had ever engaged in any such activity and, indeed, two of the Wolfsons' immediate neighbors testified that Adam's presence was not annoying to them at all.

As an additional explanation for the exclusionary policy, the apartment manager testified that the Marina Point complex had no special facilities for children, such as playground equipment, and no suitable area for children to play. The manager conceded, however, that the facilities of the complex had remained unaltered since the landlord had implemented its "no children" policy. In addition, the evidence revealed that, even at the time of trial, seven children were still living in apartments in the Marina Point complex.

Finally, the landlord presented testimony of two expert witnesses who had been in the real estate business for many years. These witnesses testified that in their opinion children, as a class, generally cause more wear and tear on property than adults do, and that as a consequence, landlords who rent to families with children generally have higher maintenance costs than landlords who exclude children. The witnesses presented no statistical data in support of their conclusion, but simply testified on the basis of their general experience.

As already noted, two immediate neighbors of the Wolfsons, one living next door and one living overhead, testified on behalf of the Wolfsons that they had not been disturbed by Adam's presence in the apartment. In addition to these neighbors' testimony, the Wolfsons presented one expert witness, a professor of real estate finance at California State University at Fullerton, who testified that the basic profitability of operating an apartment complex does not generally vary with the type or age of its tenants. Finally, the Wolfsons introduced a number of recent studies by various groups documenting the extensive

nature of the practice of discrimination against families with children in rental housing that currently exists throughout California. As these and more recent studies reveal, in many of the major metropolitan areas of the state, families with children are excluded from 60 to 80 percent of the available rental housing.[1]

At the conclusion of the trial, the municipal court ruled in favor of Marina Point, rejecting the Wolfsons' contention that the landlord's policy of excluding all families with children violated their statutory or constitutional rights. The court's formal findings of fact contain findings, inter alia, that the landlord's "exclusion of children ... proceeds from a reasonable economic motive to promote a quiet and peaceful environment free from noise and damage caused by children." Yet the court's memorandum opinion reveals that the court's *legal* conclusion that the practice in question did not violate any prohibited discrimination rested on the erroneous belief that the statutory proscription of discrimination applied only to a limited number of specifically designated "protected classes."[2] Because the municipal court could find "no

---

[1] See, for example, Note, *Landlord Discrimination Against Children* (1978) 11 Loyola L.A.L.Rev. 609, 611-613; Ashford & Eston, The Extent and Effects of Discrimination Against Children in Rental Housing: A Study of Five California Cities (1979); City of Campbell, Survey of Rental Policies Relating to Families with Children (1979); City of Mountain View, Children in the Housing Market (1978).

Similar discrimination in rental housing against families with children apparently exists in many regions throughout the country. (See, e.g., Reid et al., Patterns of Discrimination Against Children in Rental Housing in the Metro-Atlanta Area (1979); Greene, Child Discrimination in Rental Housing: A Comparative Analysis of Apartment Policies in Dallas, Texas (1979); Travalio, *Suffer the Little Children—But Not in My Neighborhood: A Constitutional View of Age-Restrictive Housing* (1979) 40 Ohio St.L.J. 295, 296-297; O'Brien & Fitzgerald, *Apartment for Rent—Children Not Allowed* (1975) 25 DePaul L.Rev. 64, 74-86.)

[2] The municipal court's memorandum opinion states in relevant part:

"The Unruh and Rumford Acts, taken collectively establish a classification of person[s] protected from discrimination in housing and business establishments. This classification includes persons discriminated against on the basis of race, religion, [national] origin, ancestry, sex and marital status. By judicial construction, this protection has been extended to homosexuals, long hairs, persons of unusual dress, persons of unusual political views, and unmarried couples living together. [Citation.]

"Not every class or person is protected. It is only such class or person that is protected as is set forth in the Statutes or who come under the Statutes by judicial determination. There is no decision to include children, parents with children, or families with children, as a protected class by the wording of the Statutes themselves, or by judicial determination. [¶] ... The Court finds that the California Statutes do not extend protection to persons in the class of defendants who are refused housing on the ground that they have a child ....

"[T]he Court ... is not indifferent to the plight of the defendants and other similarly situated persons as parents or families with children. The Court is satisfied that

decision to include children, parents with children, or families with children, as a protected class by the wording of the statutes themselves, or by judicial determination," the court concluded that the exclusionary practice challenged in this case fell beyond the reach of the state's existing antidiscrimination statutes. The court accordingly entered judgment in favor of the landlord, awarding it possession of the premises, $1,903.50 in damages, $3,000 in attorney fees and costs.[3]

The Wolfsons now appeal from the judgment, asserting that both the Unruh Act and the Fair Housing Law bar the landlord's admitted policy of discriminating against families with children. They additionally contend that the exclusion violates their rights to familial privacy and equal protection of the law guaranteed by the state and federal Constitutions. As noted above, because we conclude that the landlord's exclusionary policy violates the Unruh Act we need not, and do not, reach the Wolfsons' additional contentions.

2. █ *Contrary to the municipal court's conclusion, the antidiscrimination provisions of the Unruh Act are not confined only to a limited category of "protected classes" but rather protect "all persons" from any arbitrary discrimination by a business establishment.*

In evaluating the legality of the challenged exclusionary policy in this case, we must recognize at the outset that in California, unlike many other jurisdictions, the Legislature has sharply circumscribed an apartment owner's traditional discretion to accept and reject tenants on the basis of the landlord's own likes or dislikes. California has brought such landlords within the embrace of the broad statutory provisions of the

---

there is a problem of major importance; that there is difficulty in obtaining housing where one has a child. The judgment of the Court in no way is to be interpreted as 'Closing one's eyes to the problem.' However, the Court is restricted to a judicial determination as the law now exists under the provisions of the applicable statutes and case law. The Court finds that there is no case law or statute placing defendants in any protected class as parents of children."

[3]After judgment was entered in favor of the landlord, the Wolfsons sought a stay of execution from the trial court pending appeal. The trial court issued a temporary stay for six months, and at the expiration of that period the Wolfsons vacated the premises. This vacation of the apartment does not render the appeal moot, however, in light of the outstanding judgment for damages, attorneys' fees and costs, as well as the general importance of the underlying issue. (See *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 622, fn. 6 [111 Cal.Rptr. 704, 517 P.2d 1168].)

Unruh Act, Civil Code section 51.[4] Emanating from and modeled upon traditional "public accommodations" legislation, the Unruh Act expanded the reach of such statutes from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters and the like, to include "all business establishments of every kind whatsoever." (See generally Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 272-294.)

For nearly two decades the provisions of the Unruh Act, in light of its broad application to "all business establishments," have been held to apply with full force to the business of renting housing accommodations. (See, e.g., *Swann v. Burkett* (1962) 209 Cal.App.2d 685, 694-695 [26 Cal.Rptr. 286]; *Abstract Investment Co. v. Hutchinson, supra,* 204 Cal.App.2d 242, 254-255; 56 Ops.Cal.Atty.Gen. 546 (1973); cf. *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 467-471 [20 Cal.Rptr. 609, 370 P.2d 313].) Indeed, in the case at bar, Marina Point apparently concedes that, like other business establishments that deal with the public, its freedom or authority to exclude "customers," i.e., prospective tenants, from the goods and services it offers, i.e., rental units, is limited by the provisions of the Unruh Act.[5]

The municipal court properly recognized that Marina Point, as a "business establishment," was generally subject to the Unruh Act. It concluded, however, that the act provided no protection to the Wolfsons because it found that the subjects, i.e., "victims," of the discriminatory practice in this case, described variously as "children" or "families with children," did not fall within what the court believed to be a limited set of "protected classes" shielded from discriminatory treatment by the

---

[4]Section 51 presently provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges or services in all business establishments of every kind whatsoever.

"This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry or national origin."

Unless otherwise noted, all statutory references are to the Civil Code.

[5]The fact that the landlord in this case is also subject to the specific antidiscrimination provisions of the California Fair Housing Law in no way diminishes the applicability of the Unruh Act. Section 35743 of the Health and Safety Code (now Gov. Code, § 12993), one of the provisions of the Fair Housing Law, explicitly provides in this regard: "Nothing contained in this part shall be construed to, in any manner or way, limit the application of Section 51 of the Civil Code." (See also Health & Saf. Code, § 35740; *Burks v. Poppy Construction Co., supra,* 57 Cal.2d 463, 469-470.)

act. As already noted, the court, in elaborating upon its understanding of the Unruh Act, stated in this regard: "Not every class is protected. It is only such class or person that is protected as is set forth in the Statutes or who come under the Statutes by judicial determination." Because discrimination against children or against families with children was not in explicit terms proscribed by the language of section 51 or by any prior judicial decision, the court determined that any such discrimination was beyond the scope of the act.

The municipal court's interpretation of the act directly conflicts with this court's interpretation of the Unruh Act a decade ago in *In re Cox, supra,* 3 Cal.3d 205. In *Cox,* an individual who claimed that he had been excluded from a shopping center because a friend with whom he was talking "wore long hair and dressed in an unconventional manner" (3 Cal.3d at p. 210), asserted that such exclusion was barred by the Unruh Act. Relying upon the fact that the act, by its terms, expressly referred only to discrimination on the basis of "race, color, religion, ancestry or national origin,"[6] the city argued in response that the act's proscriptions were limited to discrimination which was based on the specifically enumerated forbidden criteria, and did not encompass the alleged discrimination against "hippies" or their associates.

After reviewing the common law origin, the legislative history and the past judicial interpretations of the act and its statutory predecessors, our court unanimously concluded in *Cox* that the "identification of particular bases of discrimination—color, race, religion, ancestry, and national origin—...*is illustrative rather than restrictive..* [Citation.] Although the legislation has been invoked primarily by persons alleging discrimination on racial grounds, its language and its history compel the conclusion that the Legislature intended to prohibit *all arbitrary discrimination by business establishments.*" (Italics added.) (3 Cal.3d at p. 216.)

In reaching this conclusion, we relied, inter alia, upon the fact that the Unruh Act had emanated from the venerable common law doctrine which "attached [to various 'public' or 'common' callings] 'certain obligations including—at various stages of doctrinal development—*the*

---

[6]Subsequent to our decision in *Cox,* the Legislature added "sex" to the bases of discrimination specifically listed in the statute. (Stats. 1974, ch. 1193, § 1, p. 2568.) The purpose and legislative history of the 1974 legislation is discussed below. (See *post,* pp. 734-735.) With the exception of this single addition, the current statute is identical to the provision as construed in *Cox.*

*duty to serve* all customers on reasonable terms without discrimination . . .'" (italics added) (*id.*, at p. 212), and upon the fact that prior judicial decisions construing the predecessors of the Unruh Act had clearly held that the statutory protections were not limited to discrimination based on race, religion, or national origin but also barred, for example, the exclusion of homosexuals from a public bar or restaurant (*Stoumen* v. *Reilly* (1951) 37 Cal.2d 713, 716 [234 P.2d 969]) or the exclusion of persons with the reputation of immoral character from a public race track. (*Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449].) Because we could find absolutely no evidence to suggest that the Legislature intended to contract the reach of the statutory protections when it enacted the expansive Unruh Act in 1959, we concluded that the act must properly be interpreted "to interdict all arbitrary discrimination by a business enterprise." (3 Cal.3d at p. 212.)

Although the landlord in this case has not at any time questioned the continued vitality of this court's decision in *Cox*, an argument has been urged that this court's unanimous decision in *Cox* was wrongly decided and should at this late date be overruled. The argument rests upon the assertion that the second sentence of section 51 is inconsistent with the interpretation of the statute in *Cox*. The sentence in question states that "[t]his section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry or national origin."

Although it is asserted that the purport of this language is self-evident, its meaning from a literal standpoint could hardly be more obscure. Read literally, the sentence appears to provide that the right of equal access to business establishments conferred by section 51 is *not* applicable to persons of every sex, color, race, etc.; that meaning, of course, would completely contradict the fundamental antidiscrimination objective of the statute. Although it is not asserted that we should adopt this interpretation of the sentence, it is suggested that the sentence should be interpreted to exclude from the statute's purview any restriction on access to a business establishment, however arbitrary, that is "applicable alike to persons of every sex, color, race, religion, ancestry or national origin." Thus, under this proposed reading of the statute, for example, the total exclusion of homosexuals or members of the Republican Party from a public restaurant, a shoe store or an apartment complex would be entirely compatible with section 51.

As we pointed out in *Cox*, however, from before the beginning of the twentieth century California's public accommodation statutes have uniformly proscribed the exclusion of individuals on the basis of purely arbitrary classifications. (See Stats. 1897, ch. 108, §§ 1, 2 p. 137; Stats. 1905, ch. 413, §§ 1, 2, pp. 553-554; Stats. 1919, ch. 210, §§ 1, 2, pp. 309-310, Stats. 1923, ch. 235, §§ 1, 2 (p. 485.) The argument under discussion proposes that we interpret the confusing, and virtually incoherent, language of the second sentence of section 51 as evidencing a legislative retreat from California's well-established statutory policy prohibiting *all* arbitrary discrimination in places of public accommodation. As we observed in *Cox*, however, "'[w]ithout the most cogent and convincing evidence, a court will never attribute to the Legislature the intent to disregard or overturn a sound rule of public policy.' [Citation.]" (3 Cal.3d at p. 215.)

Moreover, subsequent to our decision in *Cox* the Legislature effectively confirmed our interpretation of the act as barring all forms of arbitrary discrimination. In 1974, the Legislature amended section 51, reenacting the prior provisions of the statute and adding "sex" to the specifically enumerated bases of discrimination listed in the Unruh Act. In sending the bill to the Governor for his signature, the Chairman of the Select Committee on Housing and Urban Affairs explained: "The purpose of the bill is to bring it to the attention of the legal profession that the Unruh Act provides a remedy for arbitrary discrimination against women (or men) in public accommodations which are business enterprises. This bill does not bring such discrimination under the Unruh Act because that Act has been interpreted as making *all* arbitrary discrimination illegal, on whatever basis. The listing of possible bases of discrimination has no legal effect, but is merely illustrative." (Original italics.) The chairman attached to his letter a copy of a legislative counsel opinion, discussing our decision in *Cox* and confirming the chairman's view of the legislation.

■ It is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction. Accordingly, reenacted portions of the statute are given the same construction they received before the amendment. (See, e.g., *In re Gladys R.* (1970) 1 Cal.3d 855, 868-869 [83 Cal.Rptr. 671, 464 P.2d 127]; *Brailsford* v. *Blue* (1962) 57 Cal.2d 335, 339 [19 Cal.Rptr. 485, 369 P.2d 13]; *Richfield Oil Corp.* v. *Public Util.*

*Com.* (1960) 54 Cal.2d 419, 430 [6 Cal.Rptr. 548, 354 P.2d 4]; *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242]; cf. *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 P.2d 359, 580 P.2d 1155]. See generally 1A Sutherland, Statutory Construction (4th ed.) § 22.33, pp. 191-192.)

In light of the legislative history noted above, this principle of construction particularly applies to the instant case for here we need not simply presume that the Legislature knew of this court's interpretation of section 51 in *Cox* at the time of the 1974 amendment; the legislative documents establish beyond question that the Legislature was well aware of *Cox*'s construction of section 51. Had the Legislature disagreed with the *Cox* interpretation, or had it desired to constrict the reach of section 51 in a manner incompatible with *Cox*, it presumably would have altered the preexisting language of the statute so to indicate. (See, e.g., *Estate of McDill* (1975) 14 Cal.3d 831, 840 [122 Cal.Rptr. 754, 537 P.2d 874].) Instead, the Legislature reenacted the previously construed language verbatim, simply adding an explicit reference to sex discrimination to highlight the statute's application in that area. Under the numerous authorities cited above, this action represents a legislative endorsement of *Cox*'s interpretation of section 51.[7]

---

[7]In arguing that the Unruh Act does not apply to discrimination by the landlords against families with children, Marina Point relies on the fact that in recent years a number of bills addressed to the issue of housing discrimination against children have been introduced in the Legislature but have not been enacted. (See Sen. Bill No. 359 (1977-1978 Reg. Sess.); Sen. Bill No. 440 (1979-1980 Reg. Sess).) California courts have frequently noted, however, the very limited guidance that can generally be drawn from the fact that the Legislature has not enacted a particular proposed amendment to an existing statutory scheme. (See, e.g., *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 480, fn. 13 [156 Cal.Rptr. 14, 595 P.2d 592].) As the Court of Appeal explained in *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 58 [69 Cal.Rptr. 480]: "The unpassed bills of later legislative sessions evoke conflicting inferences. Some legislators might propose them to replace an existing prohibition; others to clarify an existing permission. A third group of legislators might oppose them to preserve an existing prohibition, and a fourth because there was no need to clarify an existing permission. The light shed by such unadopted proposals is too dim to pierce statutory obscurities. As evidence of legislative intent they have little value. [Citations.]"

In view of the legislative history of the 1974 amendment discussed above, the observations of the *Sacramento Newspaper Guild* court appear particularly apt. As we have seen, in 1974 the Legislature noted that section 51 applied to all arbitrary discrimination and that "[t]he listing of possible bases of discrimination has no legal effect, but is merely illustrative." Thus, the nonenactment of the bills in question might well reflect a determination that there is no need to clarify the existing prohibition. Moreover, each of the bills in question contained a variety of provisions which would have excepted cer-

Indeed, in recent years, a spate of decisions by the appellate courts and the opinions of the Attorney General have explicitly concluded, in a variety of contexts, that the Unruh Act covers a wide range of discriminatory practices. Thus, for example, the decisions and opinions have established the act's application to exclusionary policies directed against (1) students (59 Ops.Cal.Atty.Gen. 70 (1976)), (2) welfare recipients (59 Ops.Cal.Atty.Gen. 223 (1976)), (3) those of a particular occupation or marital status (58 Ops.Cal.Atty.Gen. 608, 613 (1975)), or (4) those who associate with blacks. (*Winchell* v. *English* (1976) 62 Cal. App.3d 125, 128-130 [133 Cal.Rptr. 20].) Unlike the municipal court decision at issue here, these numerous decisions properly recognize that the protection against discrimination afforded by the Unruh Act applies to "all persons," and is not reserved for restricted categories of prohibited discrimination. Accordingly, the municipal court's decision in this case unquestionably proceeded from a fundamental misinterpretation of the Unruh Act.

3. ■ *The landlord's blanket exclusion of all families with minor children is not permissible under the Unruh Act even if children "as a class" are "noisier, rowdier, more mischievous and more boisterous" than adults.*

The landlord maintains, however, that even if the municipal court erred in concluding that the Unruh Act did not apply because children or families with children were not a "protected class" under the act, the judgment in its favor should nonetheless be affirmed. It asserts that the trial court's findings of fact demonstrate that its policy of excluding all families with children from its apartment complex is "reasonable" and not "arbitrary" and, as such, is not barred by the Unruh Act.

In this regard, the landlord correctly points out that in *Cox* we explained that while the Unruh Act prohibits a business establishment from engaging in any form of arbitrary discrimination, the act does not

---

tain designated housing facilities from the bill's ban on discrimination against families with children; thus, nonpassage might also be attributable to disagreement with the scope of such exceptions, rather than with the general prohibition on discrimination against children.

In addition, we note that although the Legislature has recently enacted specific provisions authorizing "adult only" restrictions in mobile home parks (see Civ. Code, §§ 798.76, 799.5, enacted Stats. 1978, ch. 1031, § 1, pp. 3183, 3185 (discussed at p. 743, fn. 11, *post*), the Legislature has not adopted any comparable provision sanctioning such restrictions in apartment complexes or in rental housing generally.

absolutely preclude such an establishment from excluding a patron in all circumstances. As we stated in *Cox*: "In holding that the Civil Rights Act forbids a business establishment generally open to the public from arbitrarily excluding a prospective customer, we do not imply that the establishment may never insist that a patron leave the premises. Clearly, an entrepreneur need not tolerate customers who damage property, injure others or otherwise disrupt his business. A business establishment may, of course, promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided. [Citation.]" (3 Cal.3d at p. 217.)

The landlord contends that the exclusionary policy at issue here falls within the category of permissible regulations to which *Cox* adverted. Marina Point acknowledges that its blanket policy of excluding all families with children cannot properly be characterized as a "deportment regulation" since it does not focus on the conduct of the individuals or families who are actually excluded by the rule. (Cf. *Hales v. Ojai Valley Inn and Country Club* (1977) 73 Cal.App.3d 25, 28-29 [140 Cal.Rptr. 555, 89 A.L.R.3d 1] (restaurant rule requiring men to wear ties).) The landlord contends, however, that in light of the trial court's factual finding that "[c]hildren are rowdier, noisier, more mischievous and more boisterous than adults," its exclusion of all children bears a rational relation to its legitimate interest in preserving an appropriate environment.

In support of its contention, the landlord relies heavily upon the case of *Flowers v. John Burnham & Co.* (1971) 21 Cal.App.3d 700 [98 Cal.Rptr. 644]. In *Flowers*, the plaintiff tenants, who had been evicted from their apartment, alleged that their landlord had violated the Unruh Act by adopting a policy of excluding all families with male children over the age of five. The trial court sustained the landlord's demurrer to the complaint and, on appeal, the Court of Appeal, in a very brief, two-and-one-half-page opinion, affirmed the trial court judgment. Although recognizing that under *Cox* the Unruh Act barred all arbitrary discrimination by such a landlord, the court upheld the landlord's policy of excluding families on the basis of their children's sex and age. Disposing of the tenant's contention in two, rather conclusory sentences, the court stated: "Because the independence, mischievousness, boisterousness and rowdyism of children vary by age and sex, Burnham, as landlord, seeks to limit the children in its apartments to girls of all ages

and boys under 5. Regulating tenants' ages and sex to that extent is not unreasonable or arbitrary." (21 Cal.App.3d at p. 703.)[8]

Although the *Flowers* court's reasoning, such as it is, does support the present landlord's position, we believe that both the landlord's contention and the *Flowers* decision rest on a fundamental misconception of the *Cox* decision and, more basically, of the *individual* nature of the statutory right afforded "all persons" by section 51. As already noted, in *Cox* we explained that the provisions of section 51 derive from the common law doctrine which imposed upon certain enterprises affected with a public interest "'the duty to serve *all* customers on reasonable terms without discrimination.'" (Italics added.) (3 Cal.3d at p. 212.) Under this common law principle, each member of the public, as an individual, possessed the right to obtain the services of such enterprises. (See, e.g., *Willis* v. *McMahan* (1891) 89 Cal. 156, 157-158 [26 P. 649]; see generally Beale on Innkeepers and Hotels (1906) pp. 42-50, 63-69.)

The rights afforded by the Unruh Act similarly are enjoyed by all persons, as individuals. As an early decision construing a predecessor of section 51 declared: "The purpose [of the statutes] is to compel a recognition of the equality of citizens in the right to the peculiar service offered by [the] agencies [covered by the acts]." (*Piluso* v. *Spencer* (1918) 36 Cal.App. 416, 419 [172 P. 412]. See also *Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357, 362 [73 P. 1050] ("The defendant is conducting a place of amusement. There is held out to the public under the guaranty of the statute the right to admission to this place of amusement and to the enjoyment of the pleasure which it affords. This is the right which the plaintiff had secured to him by the law, in common with all other inhabitants of the state . . . ."); *Perrine* v. *Paulos* (1950) 100 Cal.App.2d 655, 657 [224 P.2d 41].)

As we recognized in *Cox*, of course, an individual may forfeit his statutory right of access to the services of a business enterprise if he conducts himself improperly or disrupts the operations of the enterprise. But, contrary to the contention of Marina Point and the suggestion of

---

[8]In *Ritchey* v. *Villa Nueva Condominium Assn.* (1978) 81 Cal.App.3d 688 [146 Cal.Rptr. 695, 100 A.L.R.3d 231], the Court of Appeal cited this passage from *Flowers* in rejecting a condominium owner's challenge to the validity of an association's bylaw which limited the occupancy of a portion of a condominium project to persons 18 years of age or older. In *Ritchey*, however, the plaintiff did not raise any claim under the Unruh Act at all, and consequently the Court of Appeal in that case did not address the question presented in the instant proceeding.

the *Flowers* case, the Unruh Act does not permit a business enterprise to exclude an *entire class* of individuals on the basis of a generalized prediction that the class "as a whole" is more likely to commit misconduct than some other class of the public.

This proposition is clearly demonstrated by our prior decisions in *Orloff* v. *Los Angeles Turf Club, supra*, 36 Cal.2d 734, and *Stoumen* v. *Reilly, supra*, 37 Cal.2d 713. Undoubtedly the class of persons with "reputations as to immoral character" was more likely than the general population. to engage in illegal activities which a public race track legitimately would seek to prevent. *Orloff* clearly held, however, that an individual could not be excluded from the race track on the basis of such classification, but rather had a right to be judged on the basis of his own conduct. Similarly, although it may have been thought true—at least under the mores of that time—that homosexuals as a class were more likely than heterosexuals to engage in the kind of "immoral conduct" that would justify expulsion from a public restaurant or bar (see, e.g., *Vallerga* v. *Dept. Alcoholic Bev. Control* (1959) 53 Cal.2d 313, 319-320 [1 Cal.Rptr. 494, 347 P.2d 909]), in *Stoumen* we held that any such class generalization did not afford a proper basis for exclusion of all homosexuals; instead, we emphasized that "[m]embers of the public . . . have a right to patronize a public restaurant and bar so long as they are acting properly and are not committing illegal or immoral acts. . . ." (37 Cal.2d 713, 716.)

Indeed, the basic rights guaranteed by section 51 would be drastically undermined if, as the landlord contends, a business enterprise could exclude from its premises or services entire classes of the public simply because the owner of the enterprise had some reason to believe that the class, taken as a whole, might present greater problems than other groups. Under such an approach, for example, members of entire occupations or avocations, e.g., sailors or motorcyclists, might find themselves excluded as a class from some places of public accommodation simply because the proprietors could show that, as a statistical matter, members of their occupation or avocation were more likely than others to be involved in a disturbance. (See, e.g., *Atwater* v. *Sawyer* (1884) 76 Me. 539 [49 Am.Rep. 634] (innkeeper's exclusion of all members of the militia, because of disorderly conduct of other militiamen, held impermissible).) Similarly, members of a particular nationality or ethnic group might be excluded from an apartment complex simply because the landlord had found from his experience that members of that nationality or ethnic group were more likely to play

loud music or to damage the landlord's property than tenants of other backgrounds.

As these examples demonstrate, the exclusion of individuals from places of public accommodation or other business enterprises covered by the Unruh Act on the basis of class or group affiliation basically conflicts with the individual nature of the right afforded by the act of access to such enterprises. As the United States Supreme Court observed in reaching a similar conclusion with respect to the antidiscrimination provisions of title VII of the federal Civil Rights Act of 1964 in *Los Angeles Dept. of Water & Power* v. *Manhart* (1978) 435 U.S. 702, 708 [55 L.Ed.2d 657, 665, 98 S.Ct. 1370]: "The statute's focus on the individual . . . precludes treatment of individuals as simply components of a racial, religious, sexual or national class. If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. *Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.*" (Italics added.)

As *Cox* makes clear, of course, under the Unruh Act exclusion on the basis of a group classification is as improper when applied to "children" or "families with children" as it is when applied to occupational, racial, religious or other broad "status" classifications. Indeed, if we were to accept the landlord's contention that a blanket exclusion of children or families with children from rental housing can be justified because children as a class are noisier, rowdier and more boisterous than adults, it would logically follow that children could uniformly be excluded from virtually all business enterprises or places of public accommodation since, like apartment complexes, most businesses can claim a legitimate interest in eliminating excessively noisy, rowdy or boisterous conduct.

As our decisions in *Cox, Orloff* and *Stoumen* teach, although entrepreneurs unquestionably possess broad authority to protect their enterprises from improper and disruptive behavior, under the Unruh Act entrepreneurs must generally exercise this legitimate interest directly by excluding those persons who are in fact disruptive. Entrepreneurs cannot pursue a broad status-based exclusionary policy that operates to deprive innocent individuals of the services of the business enterprise to which section 51 grants "all persons" access.[9]

---

[9]Although the case of *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288 [131 Cal.Rptr. 547] involved a landlord's threatened eviction of a tenant on the basis of

4. ▮▮ *Neither the nature of the business enterprise nor the nature of the facilities justifies the blanket exclusion of all families with children from the Marina Point apartment complex.*

Finally, the landlord argues that even if the potential misbehavior of children as a class does not justify its exclusionary practice under the Unruh Act, its "no children" policy may nonetheless be sustained as reasonable on the ground that the presence of children basically does not accord with the nature of its business enterprise and of the facilities provided. In this regard, the landlord attempts to analogize its contemplated "adults only" apartment complex to such businesses as bars, adult book stores and theaters, or senior citizen convalescent homes or housing facilities which routinely exclude children from their premises or services.

In our view, the suggested analogy clearly fails. Stated simply, nothing in the nature of an ordinary apartment complex is incompatible with the presence of families with children. Indeed, as the record in this case indicates, prior to its decision to exclude children in 1974, the landlord freely rented its apartments to families with children and, even at the time of trial, several families with children continued to reside in the complex.

Unlike the exclusion of children from bars or adult book stores or movie theaters, the Marina Point complex's exclusionary policy cannot, of course, be defended by reference to any statutorily sanctioned restriction on the activities of children. (Cf., e.g., Bus. & Prof. Code, § 25658 (furnishing alcoholic beverages to person under 21); Pen. Code, § 313.1 (distributing "harmful matter" to a minor).)

---

the tenant's own conduct and thus is clearly distinguishable from the instant matter, some language in the *Newby* opinion does conflict with the above analysis of the Unruh Act and must be disapproved. In *Newby*, the court stated: "Action by a landlord which does not restrict the right of a tenant to insure habitable living premises, and does not discriminate on the basis of race, sex, color, religion, ancestry, or national origin, is not actionable under the [Unruh Act] if it proceeds from a motive of rational self-interest, i.e., if it is 'rationally related to the facilities provided.'" (*Id.*, at p. 302.)

This statement is surely overbroad since an entrepreneur may pursue many discriminatory practices "from a motive of rational self-interest," e.g., economic gain, which would unquestionably violate the Unruh Act. For example, an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a "rational" economic motive would not, of course, validate the practice. (See *Stoumen v. Reilly, supra,* 37 Cal.2d 713.)

Moreover, the exclusionary practice at issue in this case is also clearly distinguishable from the age-limited admission policies of retirement communities or housing complexes reserved for older citizens. Such facilities are designed for the elderly and in many instances have particular appurtances and exceptional arrangements for their specified purposes. The special housing needs of the elderly in contemporary American society have been extensively chronicled,[10] and both the state and federal governments have enacted specific "age-conscious" legislative measures addressed to this problem. (See, e.g., Health & Saf. Code, § 51230 (reserving proportion of state-financed low income housing for occupancy by elderly); 12 U.S.C. § 1701q (federal loan program for housing for elderly families); 42 U.S.C. § 1485 (same).)

■ In light of the public policy reflected by these legislative enactments, age qualifications as to a housing facility reserved for older

---

[10]See, for example, 2 White House Conference on Aging, Toward a National Policy on Aging (1971) 29-36; President's Task Force on Aging, Toward a Brighter Future for the Elderly (1970) 38-40; Hearings on Condominium Conversions and the Elderly before the California Assembly Committee on Aging (1978).

In *Taxpayers Ass'n of Weymouth Tp.* v. *Weymouth Tp.* (1976) 71 N.J. 249 [364 A.2d 1016, 1026-1028], the New Jersey Supreme Court, in a thoughtful and well-documented opinion, explained at some length the numerous factors underlying the special housing needs of the elderly. The court stated: "In part the need of the elderly for specialized housing results from the fixed and limited incomes upon which many older persons are dependent.... [¶] In part, though, the needs for specialized housing transcends economic status and results from the particular physical and social problems of the elderly ... '... To the elderly, accidents in the home are a real danger. Falls, for example, are the leading cause of accidental death for those 65 and over.... [Housing p]lans should include more and wider walkways with fewer stairs, an interior and exterior designed to permit easy social contact, provision for common rooms, short distances between buildings, easy refuse collection, light maintenance and well-lighted walkways and halls....'

"Though special social and psychological needs of the elderly are perhaps less obvious than their physical needs, they are no less real. The elderly are apt to be less mobile than younger persons. They may have lost friends and relatives of comparable age and background. As a result, readily accessible companionship becomes increasingly important to them. In addition, the fact that children may have moved away sometimes causes elderly persons to seek an age-homogeneous environment to replace broken family ties.... Such an environment also helps older citizens to adjust to the social and psychological effects of retirement.... In addition, age-homogeneous communities afford a sense of security to their residents and thereby reduce the fear of criminal victimization.... Finally, these communities facilitate social relations and increase opportunities for the peer contact which many older persons need and desire." (364 A.2d at pp. 1026-1028 [citations omitted].) (See also Teaff et al., *Impact of Age Integration on the Well-Being of Elderly Tenants in Public Housing* (1978) 33 J. Gerontology 126 (empirical study finding that elderly tenants "living in age-segregated environments ... participate more in organized activities within the housing environment, ... have higher morale, higher housing satisfaction, and greater mobility in their neighborhoods").)

citizens can operate as a reasonable and permissible means under the Unruh Act of establishing and preserving specialized facilities for those particularly in need of such services or environment. (See, e.g., *Taxpayers Ass'n. of Weymouth Tp.* v. *Weymouth Tp., supra*, 71 N.J. 249 [346 A.2d 1016, 1026-1030]; 58 Ops.Cal.Atty.Gen. 608, 613 (1975).)[11] Such a specialized institution designed to meet a social need differs fundamentally from the wholesale exclusion of children from an apartment complex otherwise open to the general public.[12]

■ Marina Point cannot plausibly claim that its exclusionary policy serves any similarly compelling societal interest. It can hardly contend, for example, that the class of persons for whom Marina Point seeks to reserve its housing accommodation, i.e., single adults or families without children, are more in need of housing than the class of persons whom the landlord has excluded from its apartment complex; indeed, precisely the opposite is true. As the Legislature stated in 1979: "The Legislature finds and declares that the state's housing problems are substantial, complex and now of crisis proportions. . . . The Legislature finds and declares that the greatest need for housing is experienced by residents at the lower end of the economic scale. Many moderate and low income households *with children* cannot normally find decent, safe and suitable housing at prices they can afford. . . ." (Italics added.) (Stats. 1979, ch. 1043, §§ 1, 2, pp. 3643-3644.) Thus, unlike the case of special housing for the elderly, the exclusionary policy at issue here exacerbates, rather than alleviates, the state's specialized housing needs.

---

[11]In light of the housing special needs of older citizens, the New Jersey Supreme Court, in the *Weymouth* case quoted at length in footnote 10, upheld the validity of a municipal zoning ordinance setting aside a portion of land for use as a mobile home park for older citizens. In reaching its conclusion, the court observed: "The role which mobile home developments can play in satisfying the special needs of the State's senior citizens is evident. First, mobile homes provide a relatively inexpensive form of housing at a time when the demand for such housing is great and its availability is limited . . . . Second, mobile home developments afford the elderly the age-homogeneous environments which many older persons now seek and desire. Finally, the size of mobile homes is ideal for older persons with both physical and financial limitations . . . ." (364 A.2d at p. 1029.)

These special features of mobile home parks, which corrolate closely with the special needs of older citizens, may well explain the fact that mobile home parks constitute the only housing facilities in which the California Legislature has explicitly authorized "adult only" restrictions. (See Civ. Code, §§ 798.76, 799.5.)

[12]Thus, contrary to the suggestion of the dissent (dis. opn., *post*, pp. 745-746), this opinion does not bar age-limited admission policies of retirement communities or housing complexes reserved for older citizens.

Finally, apartment house living is by no stretch of the imagination the type of dangerous or hazardous activity as to which the exclusion of children might be defended on health or safety grounds. Although certain facilities offered by an apartment complex may possibly be withheld from children pursuant to such a safety rationale, a landlord cannot seize upon the availability of such incidental facilities as a justification for closing off all of its principal services, i.e., housing accommodations, to the broad class of families with children.[13] If the rule were otherwise, of course, a proprietor could easily circumvent the Unruh Act's prohibitions simply by adding some incidental facility which posed a special danger to an undesired class of potential patrons. The fundamental right of equal access to public business enterprises established by the Unruh Act cannot be so readily defeated.

### 5. *Conclusion.*

A society that sanctions wholesale discrimination against its children in obtaining housing engages in suspect activity. Even the most primitive society fosters the protection of its young; such a society would hardly discriminate against children in their need for shelter. Yet here the landlord would single out children as a class for exclusion from shelter although such discrimination against racial minorities or religious groups would be unquestionably illegal. Indeed, under the Unruh Act we have condemned *any* arbitrary discrimination against any class.

The argument is launched that children clearly may be excluded from certain kinds of housing, such as housing for the aged, housing for

---

[13]Although one argument urged in defense of the exclusion of families with children from Marina Point rests upon the presence of swimming pools on the premises, the landlord's own actions reveal the hollowness of the contention. The swimming pools were part of the apartment complex long before the landlord instituted its "adults only" program. If the pools were not incompatible with the presence of children during the period before the new program, the pools could hardly become prohibitively dangerous after the institution of that program.

Moreover, the landlord's ostensible concern for the safety of children has never led it to adopt the less restrictive practice of simply excluding children from the use of the pools. Instead, the evidence at trial established that the landlord has routinely permitted both the remaining resident children and children of guests to use its swimming facilities. Under these circumstances, the presence of the swimming pools cannot possibly justify the landlord's broad exclusionary policy.

Finally, we note that the asserted "special features" on which the dissent relies—swimming pools with no shallow ends, no playgrounds, ungated gangplanks to the ocean—are hardly the kind of amenities which would suggest that this apartment complex was intended solely for "our middle aged or older citizens" on whose behalf the dissent defends the complex's exclusionary policy. (See dis. opn. *post,* pp. 745-746.)

special classes or purposes, and therefore that the instant exclusion is justified. But we do not here adjudge such special purpose housing. We have before us a mammoth apartment complex consisting of 846 separate apartments which proposes to engage in wholesale discrimination against children. To permit such discrimination is to approve of widespread, and potentially universal, exclusion of children from housing. Neither statute nor interpretation of statute, however, sanctions the sacrifice of the well-being of children on the altar of a landlord's profit, or possibly some tenants' convenience.

The judgment is reversed.

Bird, C. J., Newman, J., Broussard, J., and White, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent.

This case illustrates a truism: the answer to a legal question frequently depends upon how the question is phrased. If the issue before us is, as framed by the majority (*ante*, p. 744) should we approve "wholesale discrimination against children," or the "universal exclusion of children from housing" or sanction "the sacrifice of the well-being of children on the altar of a landlord's profit, or possibly some tenants' convenience," the answer is a thundering "no." We'll choose children over a landlord's profit and greed every time. If, however, the question is put a little differently, and we inquire—do our middle aged or older citizens, having worked long and hard, having raised their own children, having paid both their taxes and their dues to society retain a right to spend their remaining years in a relatively quiet, peaceful and tranquil environment of their own choice? The answer to such a question is, why not? There are two conflicting social policies present in this case, and a just society including its law courts should try to accommodate and serve them both.

The majority does not identify any constitutional violations here. Rather it bases its sweeping holding exclusively on the Unruh Civil Rights Act (Civ. Code, § 51). Section 51 provides as follows: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind

---

*Assigned by the Chairperson of the Judicial Council.

whatsoever. [¶] This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, or national origin."

We closely examined this section in *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992], and held that its enumeration of prohibited forms of discrimination was "illustrative, rather than restrictive" (p. 212) and not only incorporated those rights which were declared by this court to exist under former civil rights legislation dealing with places of "public accommodation and amusement" (see *Stoumen v. Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969]; *Orloff v. Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449]) but also extended those rights, in the words of the statute, to "all business establishments of every kind whatsoever." Thus, we concluded, the Unruh Act does more than prohibit the enumerated forms of discrimination in all business establishments. "[B]oth its history and its language disclose a clear and large design to interdict *all arbitrary discrimination* by a business enterprise." (3 Cal.3d, at p. 212, italics added.) Having so held, we were very careful to explain that this ban, however comprehensive in scope, was not absolute in application. There was no violation of the Unruh Act, we noted, by the establishment and enforcement of *"reasonable regulations that are rationally related to the services performed and facilities provided."* (*Ibid.*, italics added.)

It seems clear to me that Marina Point (1) is a "business establishment" within the meaning of, and therefore subject to, the Unruh Act (*Flowers v. John Burnham & Co.* (1971) 21 Cal.App.3d 700, 703 [98 Cal.Rptr. 644]; *Swann v. Burkett* (1962) 209 Cal.App.2d 685, 694-695 [26 Cal.Rptr. 286]; cf. *Abstract Investment Co. v. Hutchinson* (1962) 204 Cal.App.2d 242, 254-255 [22 Cal.Rptr. 309]; see also 56 Ops. Cal.Atty.Gen. 546 (1973)), and (2) has not violated the Unruh Act if its rental policy was a "reasonable regulation[] . . . rationally related to the services performed and facilities provided." (*Cox, supra*, 3 Cal.3d at p. 212.) Under the circumstances of this case, the trial court concluded that plaintiff's policy was reasonable. I agree with its conclusion.

The trial court made express findings of fact that the facilities at Marina Point are "designed for use by adults, not children, and pose dangers to children who are not accompanied by adults." It further expressly found that plaintiff Marina Point's "exclusion of children from

the premises at issue herein is rationally related to the lack of facilities provided for children . . . ." These findings were amply supported by the record. The evidence before the trial court established, in substance, that Marina Point was designed and constructed for the purpose of providing all-adult rental housing, and that as such its facilities were ill-adapted for use by children. There was unchallenged testimony that, among other things, neither of the two swimming pools of the facility has a shallow end; there are no playgrounds or any other facilities appropriate for recreational use by children; gang-planks leading from the facility directly to the adjoining ocean are not equipped with gates; and, in general, the use of existing facilities at Marina Point by children when playing results in substantial danger both to themselves and to adult tenants alike.

The majority attempts to discount the force of these findings by observing that Marina Point, prior to the 1974 decision to accept no further tenants with children, freely rented to families having children. It is suggested, in short, that the adaptability of the premises to use by children is demonstrated by the fact that they have actually resided there. This proposition, its logical failings aside, must be considered in the light and context of the record which reflects that plaintiff became the owner of the complex in 1972, several years after it was built; that at that time, as a result of existing leases, there were children included among the tenants; and that in 1974, two years after acquiring the property and because of its experience during that period, plaintiff decided that no further leases to families with children would be entered into, but that families with children then in occupancy should be allowed to remain.

I do not agree with the majority's suggestion that one who purchases property which is constructed and designed for all-adult rental occupancy is thereafter for all time precluded under the Unruh Act from putting that property to its intended use because a prior owner had chosen to do otherwise. Here, plaintiff purchased property which was subject to outstanding leases and a then current rental policy which had previously permitted occupancy inconsistent with the design for the complex.

Our sole inquiry, under *Cox*, is to determine whether the landlord has acted reasonably—i.e., whether in initiating and enforcing its new policy, it has done so by regulations which are reasonable in light of the circumstances and "rationally related to the services performed and fa-

cilities provided." (*Cox, supra*, at p. 212.) The trial court's conclusion that plaintiff's action met this standard is fully supported by the court's express findings of fact and substantial evidence in this record. (See *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63-64 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) It has long been our rule that our review "begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231].)

Because the majority declines to reach defendants' constitutional arguments, I, accordingly, do not discuss them here other than to observe that the equal protection and due process principles relied upon by defendants place no restrictions upon purely *private* action, but affect only *state* action, which is not involved here. (*Garfinkle* v. *Superior Court* (1978) 21 Cal.3d 268, 281-282 [146 Cal.Rptr. 208, 578 P.2d 925]; *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 366-367 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266]; *Shelley* v. *Kraemer* (1948) 334 U.S. 1, 13 [92 L.Ed. 1161, 1180, 68 S.Ct. 836, 3 A.L.R.2d 441]; *Civil Rights Cases* (1883) 109 U.S. 3, 11-19 [27 L.Ed. 835, 839-842, 3 S.Ct. 18]; see also *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 468, 493 [156 Cal.Rptr. 14, 595 P.2d 592].)

I fully share the majority's concern with the current need in this state for moderate and low income housing for families with children. We should impose no restriction on the power of either state or local government, through the proper exercise of their police powers, to enact measures calculated to insure that all families with children are able to secure adequate and affordable housing. In the matter before us, however, the majority simply disagrees with the explicit fact findings of a trial court which listened to the witnesses, examined the evidence, and expressly found as a fact that the premises in question were planned and built for all-adult tenants and not for children. On the basis of these findings, there is nothing in the Unruh Act which prohibits limitations here imposed. It is not unreasonable that the rental policies of an apartment complex be tailored and fashioned to match its planned design and character. If the trial court had found as a fact that the premises were designed for *general* use a different legal conclusion would follow.

I would dismiss the appeal of plaintiff Marina Point from the order after judgment taxing costs, and would affirm the judgment.

Mosk, J., concurred.

Respondent's petition for a rehearing was denied April 8, 1982. Mosk, J., and Richardson, J., were of the opinion that the petition should be granted.