[L.A. No. 31495. May 9, 1983.]

JOHN P. O'CONNOR et al., Plaintiffs and Appellants, v.
VILLAGE GREEN OWNERS ASSOCIATION, Defendant and Respondent.

VILLAGE GREEN OWNERS ASSOCIATION, Plaintiff and Respondent, v.
JOHN P. O'CONNOR et al., Defendants and Appellants.

COUNSEL

Frank Pestana, Jean E. Kidwell, Eugene C. Gratz and Gratz & Starler for Plaintiffs and Appellants and Defendants and Appellants.

Ira Reiner, City Attorney (Los Angeles), Thomas V. Bonaventura, Colin Chiu, Assistant City Attorneys, Steven G. Polard, Fred Okrand, Harry M. Snyder, Marjorie Gelb, Brian Hembacher, Thomas J. Allen, Sidney M. Wolinsky, Wenke, Taylor, Evans & Ikola and Douglas W. Oldfield as Amici Curiae on behalf of Plaintiffs and Appellants and Defendants and Appellants.

Raiskin & Revitz, Boren, Elperin, Howard & Sloan, Steven J. Revitz, William Elperin and Tamila C. Jensen for Defendant and Respondent and Plaintiff and Respondent.

Lazof & Swanson, C. Brent Swanson, Terry R. Dowdall and John A. Cone, Jr., as Amici Curiae on behalf of Defendant and Respondent and Plaintiff and Respondent.

OPINION

KAUS, J.—These consolidated appeals involve the validity and enforceability of an age restriction in the covenants, conditions and restrictions (CC & Rs) of a condominium development which limits residency to persons over the age of 18. In *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115], we recently condemned such an age restriction in an apartment complex as violative of the Unruh Civil Rights Act (Civ. Code, § 51). We conclude that the age restriction in the CC & Rs of a condominium development also violates the act.

The Village Green is a housing complex of 629 units in the Baldwin Hills area of Los Angeles. It was built in 1942 and was operated as an apartment complex until 1973 when it was converted to a condominium development. As

part of the condominium conversion the developer drafted and recorded a declaration of CC & Rs which run with the property and which contain a prohibition against residency by anyone under the age of 18.[1] The CC & Rs also establish the Village Green Owners Association (association) and authorize it to enforce the regulations set forth therein. The association is a nonprofit organization whose membership consists of all owners of units at Village Green.

John and Denise O'Connor bought a two-bedroom unit in Village Green in 1975. On July 4, 1979, their son Gavin was born. Shortly thereafter, the association gave them written notice that the presence of their son Gavin in the unit constituted a violation of the CC & Rs and directed them to discontinue having Gavin live there.

After making unsuccessful attempts to find other suitable housing, the O'Connors filed a complaint against the association seeking to have the age restriction declared invalid and to enjoin its enforcement. The first amended complaint alleged, inter alia, that the age restriction violated the Unruh Civil Rights Act (Civ. Code, § 51).[2] The association filed a general demurrer which the trial court sustained without leave to amend. The action was dismissed and the O'Connors appealed.

After the O'Connors' notice of appeal was filed, the association filed an action to enjoin the O'Connors from residing in the condominium with their son. The trial court granted a preliminary injunction but stayed its enforcement for 90 days to allow the O'Connors to find other housing. The O'Connors filed a notice of appeal. ■ Since the preliminary injunction was mandatory, the filing of the notice of appeal stayed its effect. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 177, p. 4166 and cases cited therein.) This opinion disposes of both appeals.

In *Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d 721, we considered the question of whether the Unruh Civil Rights Act (the act) prohibited an apartment owner's discrimination against children. We reviewed the history of the act—Civil Code section 51—and noted that it had emanated from earlier "public accommodation" legislation and had extended the reach of such statutes from common carriers and places of accommodation to cover "all

---

[1]The parties do not dispute that the CC & Rs run with the property.

[2]The complaint also alleged that the age restriction violated: (1) the Los Angeles City Ordinance which prohibits discrimination in rental housing on the basis of age, parenthood, or pregnancy; (2) the Fourteenth Amendment of the United States Constitution and article I, section 1, of the California Constitution; and (3) the California Fair Housing Law (Health & Saf. Code, § 35700 et seq.).

business establishments of every kind whatsoever."[3] Relying on our interpretation of the act in *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992], we held that the act barred all types of arbitrary discrimination. The act's reference to particular bases of discrimination—"sex, color, race, religion, ancestry or national origin"—was illustrative rather than restrictive.

We noted, however, that although the act prohibits a business establishment from engaging in any form of arbitrary discrimination, it does not absolutely prohibit such an establishment from excluding a customer in all circumstances. " 'Clearly, an entrepreneur need not tolerate customers who damage property, injure others or otherwise disrupt his business. A business establishment may, of course, promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided.' " (*Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d at p. 737; quoting from *In re Cox, supra,* 3 Cal.3d at p. 217.) We rejected, however, the landlord's contention in *Marina Point* that the exclusion of children was such a reasonable restriction. It was not a sufficient justification to state that children are "rowdier, noisier, more mischievous and more boisterous than adults." (30 Cal.3d at p. 737.) Exclusion of persons based on a generalization about the class to which they belong is not permissible. (*Id.,* at pp. 736-740.) Nor could exclusion of children from an ordinary apartment complex be justified on the basis that the presence of children does not accord with the nature of the business enterprise and of the facilities provided—as might be said of bars, adult book stores and senior citizens homes. (*Id.,* at p. 741.)

In sum, we held in *Marina Point* that the landlord's blanket exclusion of children from residency was prohibited by the act. It could not be justified by any claim about generalized characteristics of children or the nature of the apartment complex. Indeed, the claim that the facilities were incompatible with the presence of children was belied by the fact that children formerly had been permitted to reside in the complex. (30 Cal.3d at p. 744, fn. 13.)

In *Marina Point* there was no question that the apartment complex was a "business establishment" within the meaning of the act. The determinative question in that case was whether the act encompassed discrimination against children. Since that question was answered in *Marina Point,* the only question to be decided in the present case is whether the discriminatory policy against children is being invoked by a "business establishment" within the meaning of the act.

---

[3]Unless otherwise noted, all section references hereafter are to the Civil Code.

Section 51 provides in relevant part: "This section shall be known, and may be cited, as the Unruh Civil Rights Act. [¶] All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

The act protects all persons from arbitrary discrimination in "accommodations, advantages, facilities, privileges or services in all business establishments of every kind whatsoever." (Civ. Code, § 51.) We discussed the scope of that language in *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313]: "The Legislature used the words 'all' and 'of every kind whatsoever' in referring to business establishments covered by the Unruh Act (Civ. Code, § 51), and the inclusion of these words without any exception and without specification of particular kinds of enterprises, leaves no doubt that the term 'business establishments' was used in the broadest sense reasonably possible. The word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.' [Citations.] The word 'establishment,' as broadly defined, includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' or 'a permanent settled position (as in life or business).' [Citation.]"

In *Burks,* we found it clear that a real estate developer who built and sold tract houses operated a "business establishment" within the meaning of the act.[4] (See also *Lee* v. *O'Hara* (1962) 57 Cal.2d 476 [20 Cal.Rptr. 617, 370 P.2d 321] [act applies to real estate broker].) We noted that the original version of the bill presented to the Legislature specifically referred to the right "to purchase real property" and to other rights, such as the obtaining of "professional" services, in addition to "business establishments." The final version, however, eliminated all specific references and added to the term "business establishments" the words "of every kind whatsoever." We concluded in *Burks* that the deletion of the specific reference to the purchase of real property could be explained on the ground that the Legislature deemed specific references no longer necessary in light of the broad language of the act as finally passed.

The O'Connors and amici urge us to apply the same reasoning to hold that the Village Green Owners Association is also a business establishment within the meaning of that term in the act. They note that among the specific references in the original version of the bill were "private or public groups, organizations, associations, business establishments, schools, and public facilities."[5] The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may rea-

[4]The developer who established the Village Green CC & Rs, of course, would similarly be subject to the act. Thus the age restriction in this case, which was established by the developer, is invalid. This does not end our inquiry, however, since, as the association points out, it could simply cancel that age restriction and adopt one of its own. We therefore must also determine whether the association itself is a "business establishment" within the meaning of the act.

[5]As introduced, the bill read in part: "All citizens within the jurisdiction of this State, no mat-

sonably be found to constitute "business establishments of every type whatsoever." Although our cases so far have all dealt with profit-making entities, we see no reason to insist that profit-seeking be a *sine qua non* for coverage under the act. Nothing in the language or history of its enactment calls for excluding an organization from its scope simply because it is nonprofit. (See Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 290-291.) Indeed, hospitals are often nonprofit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees to those who use the facilities. The Village Green Owners Association has sufficient businesslike attributes to fall within the scope of the act's reference to "business establishments of every kind whatsoever." Contrary to the association's attempt to characterize itself as but an organization that "mows lawns" for owners, the association in reality has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629-unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders. A theme running throughout the description of the association's powers and duties is that its overall function is to protect and enhance the project's economic value. Consistent with the Legislature's intent to use the term "business establishments" in the broadest sense reasonably possible (*Burks* v. *Poppy Construction Co.*, *supra,* 57 Cal.2d at p. 468), we conclude that the Village Green Owners Association is a business establishment within the meaning of the act.

Anticipating that it might be found to be a business establishment for purposes of applicability of the act, the association attempts to distinguish its discriminatory policy from that in *Marina Point* on the ground that it has fewer effective remedies for abating a nuisance caused by a child. Although a landlord does have the summary remedy of unlawful detainer proceedings for dealing with a disruptive child, we are not persuaded that the association is so powerless to remedy any problems arising from particular conduct that it must

---

ter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, and privileges in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities; to purchase real property; and to obtain the services of any professional person, group or associations." (See *Burks* v. *Poppy Construction Co.*, *supra,* 57 Cal.2d at p. 469, fn. 3.)

be permitted to maintain a discriminatory policy based on generalized traits. The association could adopt deportment regulations and rely on its normal procedures to enforce them. No reason appears why that would be any less effective than other use and conduct regulations the association may have. Moreover, we note that the restrictive covenant against children is already invalid under *Marina Point* as to units held as income property and rented out by their owners. (See *Swann* v. *Burkett* (1962) 209 Cal.App.2d 685, 694-695 [26 Cal.Rptr. 286].) The association therefore is already faced with the burden of planning for the presence of children.

The judgments in both actions are reversed.

Bird, C. J., Reynoso, J., and Stern, J.,* concurred.

**BROUSSARD, J.**—I fully concur in the majority opinion. I would also rest our holding, however, on Civil Code section 53 as well as on Civil Code section 51.[1]

Section 51 prohibits discrimination by a "business establishment" on grounds of "sex, race, color, religion, ancestry, or national origin . . . ." Section 53 deals more specifically with the problem of discriminatory restrictions on the use of real property. It provides in part: "(a) Every provision in a written instrument relating to real property which purports to forbid or restrict the conveyance, encumbrance, leasing, or mortgaging of such real property to any person of a specified sex, race, color, religion, ancestry, or national origin, is void and every restriction or prohibition as to the use or occupation of real property because of the user's or occupier's sex, race, color, religion, ancestry, or national origin is void. [¶] (b) Every restriction or prohibition, whether by way of covenant, condition upon use or occupation, or upon transfer of title to real property, which restriction or prohibition directly or indirectly limits the acquisition, use or occupation of such property because of the acquirer's, user's, or occupier's sex, race, color, religion, ancestry, or national origin is void. [¶] . . ." Thus, *section 53 nullifies the arbitrarily discriminatory restriction itself.* Since the restriction is void, no party to it may enforce it, regardless of whether that party constitutes a "business establishment" under section 51.

Section 53 includes the same critical phrase as section 51: "sex, race, color, religion, ancestry, or national origin." In *In re Cox* (1970) 3 Cal.3d 205, 216 [90 Cal.Rptr. 24, 474 P.2d 992], we interpreted this phrase as used in section 51 as being "illustrative rather than restrictive. . . . Although the legislation

---

*Assigned by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, all references hereinafter are to the Civil Code.

has been invoked primarily by persons alleging discrimination on racial grounds, its language and its history compel the conclusion that the Legislature intended to prohibit all arbitrary discrimination by business establishments." Thus, in *Cox,* we determined that section 51 necessarily applies to young men wearing long hair and unconventional dress, despite the lack of specification of "hippie" in the critical phrase.

In *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115], we reaffirmed our view in *Cox* that the critical phrase was merely illustrative and not all-inclusive. In holding that section 51 applied to prohibit arbitrary discrimination against families with children in renting housing, we noted that even the Legislature has recognized that the critical phrase in section 51 is merely illustrative. "In 1974, the Legislature amended section 51, reenacting the prior provisions of the statute and adding 'sex' to the specifically enumerated bases of discrimination listed in the Unruh Act. In sending the bill to the Governor for his signature, the Chairman of the Select Committee on Housing and Urban Affairs explained: 'The purpose of the bill is to bring it to the attention of the legal profession that the Unruh Act provides a remedy for arbitrary discrimination against women (or men) in public accommodations which are business enterprises. This bill does not bring such discrimination under the Unruh Act because that Act has been interpreted as making *all* arbitrary discrimination illegal, on whatever basis. The listing of possible bases of discrimination has no legal effect, but is merely illustrative.' (Original italics.) The chairman attached to his letter a copy of a legislative counsel opinion, discussing our decision in *Cox* and confirming the chairman's view of the legislation. [¶] . . . Instead [of altering preexisting language to expressly reject our *Cox* interpretation], the Legislature reenacted the previously construed language verbatim, simply adding an explicit reference to sex discrimination to highlight the statute's application in that area. Under the numerous authorities cited above, this action represents a legislative endorsement of *Cox*'s interpretation of section 51." (*Wolfson, supra,* at pp. 734-735; fn. omitted.)

Section 51, originally enacted in 1905 (Stats. 1905, ch. 413, § 1, p. 553) had been substantially amended to resemble more closely its current form in 1959 (Stats. 1959, ch. 1866, § 1, p. 4424). Two years later, section 53 was enacted (Stats. 1961, ch. 1877, § 1, pp. 3976-3977) and placed in close proximity to section 51 in part 2 of the Civil Code, entitled "Personal Rights." Section 53 contained the same critical phrase embodied in section 51 at that time. The critical phrase in section 53 has been amended only once since its enactment, and in the same 1974 legislation which amended the same clause in section 51. (Stats. 1974, ch. 1193, § 1, p. 2568.)

These legislative actions clearly indicate that the Legislature has intended the critical phrase of section 53 to receive the same illustrative reading as is given

to the identical phrase of section 51. Such an illustrative reading must similarly prohibit the *arbitrary discrimination* against families with children found to violate section 51 in *Wolfson*.[2]

An illustrative reading of section 53 is not barred by our previous decision in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592]. In that case, we refused to give an expansive interpretation to former Labor Code section 1410 et seq. (formerly entitled the California Fair Employment Practices Act (FEPA); currently enacted as Gov. Code, § 12920 et seq., entitled the Fair Employment and Housing Act), which prohibited discrimination in employment on the grounds of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex or age. We rejected the argument that discrimination against homosexuals was barred by the act, and distinguished the act from section 51 as interpreted in *Cox*. "[W]hereas the Unruh Act represented a codification of the common law principle barring *all* discrimination by public accommodations in the provision of services, the prohibitions on employment discrimination contained in the FEPA are in no sense declaratory of preexisting common law doctrine but rather include areas and subject matters of legislative innovation, creating new limitations on an employer's right to hire, promote or discharge its employees. Under these circumstances, the rationale of *Cox* is inapplicable to the FEPA, and the specifically enumerated categories as to which discrimination is prohibited cannot be viewed as simply 'illustrative.' Indeed, the fact that the Legislature has repeatedly amended the FEPA in recent years, protecting successively the categories of sex (Stats. 1970, ch. 1508, § 4, p. 2995), age (Stats. 1972, ch. 1144, § 1, p. 2211; Stats. 1977, ch. 851, § 2, p. 2553), physical handicap (Stats. 1973, ch. 1189, § 6, p. 2501), medical condition (Stats. 1975, ch. 431, § 5, p. 925) and marital status (Stats. 1976, ch. 1195, § 5, p. 5461), affords a rather strong indication that the Legislature itself does not regard the original 1959 act as a bar to all forms of arbitrary discrimination." (*Gay Law Students, supra,* at p. 490.)

The history of former Labor Code section 1410 et seq. (FEPA) is quite distinguishable from that of section 53. First, the former FEPA was originally enacted in 1959 (Stats. 1959, ch. 121, § 1, pp. 1999-2005), the same year that section 51 was substantially amended, yet FEPA was placed in the Labor Code and *not* in the Civil Code as was section 53 two years later.

Second, the former FEPA was the subject of numerous amendments setting forth additional categories of barred discrimination. By contrast, both section 51 and 53 were amended but once, in the same legislation.

---

[2]Thus, as in *Wolfson*, restricting occupancy in a particular neighborhood to the elderly to create a senior environment may prove to be rationally related to a legitimate purpose, and *not* constitute arbitrary discrimination under section 53.

Third, when the former FEPA was repealed (Stats. 1980, ch. 992, § 11, p. 3166), it was reenacted with substantial changes as the Fair Employment *and Housing* Act (Stats. 1980, ch. 992, § 4, pp. 3140-3165; Gov. Code, § 12900 et seq.): a combination of prohibitions of discrimination in employment and housing in the same legislation. The Legislature did *not,* however, repeal section 53, which nullifies discriminatory restrictions on the use or occupation of real property, but left that section intact.

Thus, it is abundantly clear that the Legislature did not intend section 53 to receive the narrowing interpretation given both the former FEPA and the current Fair Employment and Housing Act. Instead, section 53, remaining untouched and in close physical proximity to section 51, and containing identical language to section 51 in its critical phrase, must be given the same broad interpretation as received by section 51 in *Cox* and *Wolfson.* Therefore, I would also hold that section 53 invalidates any covenant, code or restriction which discriminates against families with children in the conveyance, occupation and use of real property.

**MOSK, J.**—I dissent.

Once again a majority of this court undertake to legislate in a field—age preference—in which the Legislature has deliberately and repeatedly refused to act over the past six or more years. Having recently devised a new edict that there can be no age barriers in the business of rentals (*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115]), the majority now extend that rule by holding that a nonprofit association of condominium apartment owners is a "business" and therefore subject to the same prohibition against discrimination that is imposed on true business establishments.

The majority are in error on both issues involved in this case. First, age preference has consistently been recognized as valid rather than invidious discrimination, both by the federal government and by the Legislature of California. Second, an association of homeowners—whether their homes are separate premises, or part of one structure as in a condominium apartment—cannot by any stretch of judicial imagination be held to be a business.

On the first point it bears emphasis that the United States Congress has adopted a number of programs to provide housing exclusively for those over 62. (See generally 12 U.S.C. § 1701 et seq., 42 U.S.C. § 1485 et seq.) If an age restriction is valid at age 62, why cannot an age restriction be placed at age 18? Age preference is age preference, regardless of the precise chronological point at which it is placed.

Meanwhile our state Legislature, with knowledge that age preferences have been established in a number of housing developments, and that each was upheld whenever challenged in court (e.g., *Ritchey* v. *Villa Nueva Condominium Assn.* (1978) 81 Cal.App.3d 688 [146 Cal.Rptr. 695, 100 A.L.R.3d 231]; *Flowers* v. *John Burnham & Co.* (1971) 21 Cal.App.3d 700 [98 Cal.Rptr. 644]), not only failed to add age to the other categories in Civil Code sections 51 and 53 which prohibit discrimination, but emphatically refused to do so whenever age was proposed as an addition to those sections. I fail to understand how my colleagues can arrogate to themselves the right to legislate in an area in which the Legislature has deliberately refused to do so.

Not only has the Legislature declined to outlaw age preferences, as recently as 1976 it placed its approval once again on Civil Code section 1355 which specifically directs, in the case of condominiums, that restrictions be recorded and they "shall be enforceable equitable servitudes where reasonable, and shall inure to and bind all owners of condominiums in the project. Such servitudes, unless otherwise provided, may be enforced by any owner of a condominium . . . ." The Legislature put only one limitation on the nature of restrictions that may be enforceable: they may not violate Civil Code section 711, which prohibits restraints on alienation. Indeed, the Legislature has preempted the entire field of condominium regulation in Civil Code section 1350 et seq., by adopting a uniform, comprehensive and pervasive means of creating condominium projects and defining the rights and obligations of owners of such projects.

On the second issue, the majority rely on *Marina Point, supra,* in which a divided court attempted to justify prohibiting age preference in the business of rental housing. In purporting to distinguish—and to permit—*some* age preferences, the majority's reasoning in that case seemed to depend on the "particular appurtenances and exceptional arrangements" (30 Cal.3d at p. 742) for those housing units which are reserved for the elderly. Apparently my colleagues were primarily contemplating the archetypical homes for the aged and infirm—the "old folks' home." But their limited exception for the aged overlooked the numerous housing developments for those not elderly, but merely over 45, or over 55, or "senior citizens"—middle-aged or older persons who, in the words of Justice Richardson, dissenting in *Marina Point,* "having worked long and hard, having raised their own children, having paid both their taxes and their dues to society retain a right to spend their remaining years in a relatively quiet, peaceful and tranquil environment of their own choice" (*id.,* p. 745).

Despite my misgivings in *Marina Point,* and those of Justice Richardson, I accept its result under compulsion. But *Marina Point* involved a business, a *rental business.* It did not affect the rights of individual owners in a condominium, bound together in a voluntary association operating for no profit,

for no business purpose, solely for protection of the owner-members. Village Green owns no property; the transformation of such a loosely knit protective association into a "business" is stretching the concept of an entrepreneurial venture beyond all reason.

The Unruh Act (Civ. Code, § 51) provides, in relevant part: "All *persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.*" (Italics added.)

Although the term "business establishments" is not defined in the foregoing code section, Chief Justice Gibson writing for a unanimous court in *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468 [20 Cal.Rptr. 609, 370 P.2d 313], defined the word "business" as: "[E]verything about which one can be *employed* and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.'*" (Italics added.) Again in *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 500 [86 Cal.Rptr. 88, 468 P.2d 216], this court, in discussing the 1959 amendments to section 51, stated in a unanimous opinion, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discrimination other than those made by a 'business establishment' in the course of *furnishing goods, services or facilities to its clients, patrons or customers.*" (Italics added.) The foregoing clearly demonstrate that the term "business establishments," as used in the Civil Code, is intended to apply only to commercial enterprises which serve customers, clients or patrons, and not to organizations which are in no way commercial or profit-seeking, such as a homeowners association.

*Marina Point* is not inconsistent with the foregoing. The majority opinion therein used the terms "business enterprise," "business establishment," or "entrepreneur" in referring to Civil Code section 51 on no less than 22 separate occasions, including the following quotes which clearly reveal the inapplicability of the section to a homeowners association: "As our prior decisions teach, the Unruh Act preserved the traditional broad authority of *owners and proprietors* of business establishments to adopt reasonable rules regulating the conduct of *patrons or tenants* . . . ." (30 Cal.3d at p. 725, italics added.) "As we stated in *Cox*: 'In holding that the Civil Rights Act forbids a business establishment *generally open to the public* from arbitrarily excluding a prospective *customer,* we do not imply that the establishment may never insist that a *patron* leave the premises. Clearly, an *entrepreneur* need not tolerate *customers* who damage property, injure others or otherwise disrupt *his business.*" (*Id.,* p. 737, italics added.) "As these examples demonstrate, the exclusion of individuals from places of *public accommodation* or other business enterprises covered by

the Unruh Act on the basis of class or group affiliation basically conflicts with the individual nature of the right afforded by the act of access to such enterprises. . . . [¶] As our decisions in *Cox, Orloff* and *Stouman* teach, although *entrepreneurs* unquestionably possess broad authority to protect their *enterprises* from improper and disruptive behavior, under the Unruh Act *entrepreneurs* must generally exercise this legitimate interest directly by excluding those persons who are in fact disruptive. *Entrepreneurs* cannot pursue a broad status-based exclusionary policy that operates to deprive innocent individuals of the services of the *business enterprise* to which section 51 grants 'all persons' access." (*Id.*, p. 740, italics added.)

A homeowners association, the principal function of which is to perform or arrange for the services an owner of a single family dwelling would normally perform or arrange—such as mowing lawns, fixing defective plumbing, repairing roofs, cutting trees and watering gardens—does not come within the definition of the term "business establishment" as it is used throughout the decision in *Marina Point.* The association has no patrons, tenants or customers, only dues-paying members; it is in no way entrepreneurial in nature; and it is not open for public patronage. To consider the association a "business enterprise" under the Unruh Act would require the ludicrous holding that the owner-resident of a single family dwelling is engaged in a "business enterprise" when he or she hires a gardener or a plumber.

Again in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 490 [156 Cal.Rptr. 14, 595 P.2d 592], this court emphasized that the Unruh Act represented a codification of the common law barring discrimination "*by public accommodations in the provision of services*" (italics added) and that other statutes on this subject "are in no sense declaratory of preexisting common law doctrine but rather include areas and subject matters of legislative innovation, creating new limitations." It followed that the statutory provisions were to be strictly construed, not merely deemed illustrative. There the court was concerned with employment practices, which would seem to be at least a first cousin to housing practices.

It is strange that the concurring opinion relies heavily upon a letter from one legislator to the Governor. That the quotation is from *Marina Point* is slim rebuttal to the rule this court recently declared in *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 701 [170 Cal.Rptr. 817, 621 P.2d 856]: "There are sound reasons underlying the rule against admitting statements of personal belief or intent by individual legislators on the issue of legislative intent . . . there is concern that letters such as those sent to the Governor on the question of signing the bill may never have been exposed to public view so that those with differing opinions as to the bill's meaning and scope had an opportunity to present their views also. . . . The statement reveals

only the author's personal opinion and understanding and accordingly, is not a proper subject for consideration in determining the Legislature's intent. . . ." The legislator, of course, was merely 1/120 of the Legislature, which as a body has consistently refused to add age restrictions to either Civil Code sections 51 or 53.

The result in this case is disastrous for the many well-conceived, constructively operated developments in this state limited to persons over a prescribed age. They may not be a major factor in other jurisdictions, but they are particularly significant in California, which has the enticing environment and equable climate to attract many persons of middle and older age. These men and women, many of them having earned their right to retirement in other parts of the country, now make a major contribution to the economy of our state. Their comfort and peace of mind should not be deemed expendable on the altar of judicial creativity.

I would affirm the judgment.

Richardson, J., concurred.