JACQUELINE MOODY, RUSSELL T. MOODY, JANE DUKE-SHERER and JOHN DUKESHERER, Plaintiffs-Appellants, *v.* CAWDREY & ASSOCIATES, INC., a foreign corporation; MARS CONSTRUCTORS, INC.; CAWDREY-MARS GENERAL, a partnership; HALE KEKOA JOINT VENTURE, dba HK-GC PARTNERSHIP, GENERAL CONSTRUCTION COMPANY, jointly dba HK-GC PARTNERSHIP; KAJIOKA, OKADA & PARTNERS, INC.; LUKO REALTY, LTD.; AARON M. CHANEY, INC.; ASSOCIATION OF APARTMENT OWNERS OF 1260 RICHARD LANE; ERNEST C. HICKSON; and FIRST HAWAIIAN DEVELOPMENT CORPORATION, Defendants-Appellees, and HOWARD BUGBEE, JOHN DOES III-X; JOHN DOE PARTNERSHIPS I-X; JOHN DOE CORPORATIONS II-X; and JOHN DOE GOVERNMENTAL ENTITIES I-X, Defendants

NO. 10052

(CIVIL NO. 62820)

JANUARY 24, 1986

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

This is an appeal by plaintiffs Russell T. and Jacqueline Moody (Moodys) and John and Jane Dukesherer (Dukesherers) (collectively Appellants) from the summary judgment in favor of defendants Association of Apartment Owners of 1260 Richard Lane (Association) and Aaron M. Chaney, Inc. (Chaney) (collectively Appellees). The appeal raises the following questions of first impression:

1. Whether a condominium owners association and its managing agent have a duty to protect condominium owners and their guests from foreseeable criminal acts committed by third parties.

2. Whether in a negligence action against a condominium owners association and its managing agent for criminal acts of third parties, the plaintiff may establish foreseeability by evidence other than prior similar criminal incidents.

We answer yes to both questions and reverse the summary judgment.

I.

The Association is an unincorporated association of apartment owners in the 1260 Richard Lane condominium project (Project).[1] Chaney is a Hawaii corporation hired by the Association as its managing agent. The Dukesherers are the owners of apartment 506A in the Project.

The evidence, viewed in the light most favorable to Appellants, as we must in reviewing a summary judgment, *Fernandes v. Tenbruggencate,* 65 Haw. 226, 649 P.2d 1144 (1982); *Silver v. George,* 64 Haw. 503, 644 P.2d 955 (1982); *Kang v. Charles Pankow Associates,* 5 Haw. App. 1, 675 P.2d 803 (1984), reveals the following facts.

The Moodys came to Hawaii from California to attend the wedding of their daughter Jane to John Dukesherer. On the evening of May 19, 1979, the Moodys were alone in apartment 506A since the Dukesherers had departed on their honeymoon. Before retiring Jacqueline locked the front door of the apartment. During the early morning hours of May 20, 1979, two unidentified males entered the apartment through the front door. To get to the apartment, the males had to use either the elevators or the stairways, which were common areas and under the control of the Association. The exact method of entry into the apartment is unknown; however, no signs of forced entry were evident.[2] The males assaulted and robbed the Moodys. Jacqueline was raped and sodomized. Russell was shot. The assailants fled and were never apprehended.

On September 17, 1980, Appellants filed a complaint against the Association, Chaney, and several other defendants.[3] The complaint alleged that Appellees "were negligent in the maintenance and manage-

---

[1]The Horizontal Property Act defines "association of apartment owners" to mean "all of the apartment owners acting as a group in accordance with the bylaws and declaration." Hawaii Revised Statutes § 514A-3 (Supp. 1984).

[2]Deposition testimony suggests entry into apartment 506A was by means of a key.

[3]The other defendants named in the complaint were the contractor Cawdrey-Mars General, a Hawaii partnership, and its general partners, Cawdrey & Associates, Inc. and Mars Constructors, Inc.; the developers Hale Kekoa Joint Venture and General Construction Company, jointly doing business as HK-GC Partnership; the architects Kajioka,

ment" of the Project and were "also responsible for the failure of the security system installed therein." Appellants prayed for special and general damages,[4] costs, and reasonable attorney's fees.

On June 28, 1983, the trial court entered its order granting Appellees' motion for summary judgment and expressly directing the entry of judgment under Rule 54(b), Hawaii Rules of Civil Procedure (1981). On May 2, 1984, a judgment was filed pursuant to the June 28, 1983 order. Appellants' timely appeal followed.[5]

## II.

"A fundamental requirement of a negligence action is the existence of a duty owed by the defendant to the plaintiff." *Namauu v. City & County,* 62 Haw. 358, 361, 614 P.2d 943, 945 (1980). *See also First Insurance Co. of Hawaii, Ltd. v. International Harvester Co.,* 66 Haw. 185, 659 P.2d 64 (1983); *Ono v. Applegate,* 62 Haw. 131, 612 P.2d 533 (1980). The existence of such a duty is "entirely a question of law." *Bidar v. Amfac, Inc.,* 66 Haw. 547, 552, 669 P.2d 154, 158 (1983). *See also Kelley v. Kokua Sales & Supply, Ltd.,* 56 Haw. 204, 532 P.2d 673 (1975).

Relying on *King v. Ilikai Properties, Inc.,* 2 Haw. App. 359, 632 P.2d 657 (1981), and the principles stated in Restatement (Second) of Torts

---

Okada & Partners, Inc.; the exclusive sales agents for the condominium apartments Luko Realty, Ltd.; and unknown defendants. On November 23, 1982, Ernest C. Hickson, Howard Bugbee, and First Hawaiian Development Corporation were identified as three of the unknown defendants.

[4]The complaint alleged that the Moodys suffered "physical injuries" and sustained "great pain and suffering." It also alleged that the Dukesherers, in conjunction with the Moodys, suffered mental distress and "were deprived of personal belongings, including but not limited to, a television set, various camera lenses and wrist watches[.]"

[5]On March 23, 1984, Appellants filed a notice of appeal from the summary judgments in favor of the other defendants in the case (*see* n.3 *supra*), except defendant Howard Bugbee who had been dismissed from the case on June 24, 1983. However, that appeal was premature since the summary judgments had not been certified under Rule 54(b), Hawaii Rules of Civil Procedure (HRCP). *See TBS Pacific, Inc. v. Tamura,* 5 Haw. App. 222, 686 P.2d 37 (1984), *aff'd mem. on other grounds* (December 14, 1984).

Our review therefore is limited to the appeal from the summary judgment in favor of Appellees which is a final judgment pursuant to Rule 54(b), HRCP.

§§ 314A, 315 (1965),[6] Appellees argue that they had no duty to protect Appellants from criminal acts of third parties because there was no "special relationship" between Appellees and Appellants.[7] Appellees therefore assert that they were entitled to a summary judgment as a matter of law. We do not agree.

A.

If the four special relationships specified in § 314A—common carrier-passenger, inkeeper-guest, landowner-invitee, and custodian-ward—were intended to be exclusive, Appellees' assertion may be correct. However, the drafters of the Restatement commented that the relations listed in § 314A "are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found." *Id.* § 314A, comment b. Moreover, the drafters expressed their view that the "law appears . . to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence." *Id.*

---

[6]Restatement (Second) of Torts §§ 314A and 315 (1965) read as follows:

§ 314A.  Special Relations Giving Rise to Duty to Aid or Protect

    (1) A common carrier is under a duty to its passengers to take reasonable action

        (a) to protect them against unreasonable risk of physical harm, and

        (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

    (2) An innkeeper is under a similar duty to his guests.

    (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

    (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

§ 315.  General Principle

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

    (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

    (b) a special relation exists between the actor and the other which gives to the other a right to protection.

[7]Appellees also contend that they had no duty to protect Appellants because Appellees "did not have occupation and control of" apartment 506A where the Moodys were assaulted and robbed. However, it is clear from the record that Appellees had control over all common areas of the Project leading to the apartment.

The realities of modern day apartment living have induced some courts to view "the landlord-tenant relationship as a 'special' one that justifies imposing a duty on the landlord to provide some protection against criminal acts." Comment, *California Landlords' Duty to Protect Tenants from Criminals,* 20 San Diego L. Rev. 859, 865 (1983). However, the courts have not held that "the landlord is by any means an insurer of the safety of his tenants." *Kline v. 1500 Massachusetts Avenue Apartment Corp.,* 439 F.2d 477, 487 (D.C. Cir. 1970). The duty imposed on the landlord "is only one to exercise *reasonable care under the circumstances.*" Restatement (Second) of Torts § 314A, comment e (emphasis added). The landlord is free of liability "where he neither knows nor should know of the unreasonable risk," and "is not required to take any action where the risk does not appear to be an unreasonable one[.]" *Id.* Further, the landlord need not "take any action until he knows or has reason to know that the plaintiff is endangered[.]" *Id.* comment f.

Basically, the landlord's duty to act arises after he has received notice, actual or constructive, of criminal activity either on his premises or in the immediate vicinity thereof.[8] *See Kline, supra; Totten v. More Oakland Residential Housing, Inc.,* 63 Cal. App. 3d 538, 134 Cal. Rptr. 29 (1977); *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976). The crucial question is that of foreseeability—whether under the facts the third parties' criminal act was a foreseeable risk against which the landlord was obligated to protect the tenant.

---

[8]There is a split in authority as to whether notice pertains only to criminal activity on the landlord's premises. One jurisdiction holds that only criminal activity occurring on the landlord's premises is relevant.

> Since the landlord can affect the risk [of personal injury or property damage from criminal activity] only within his own premises, ordinarily only criminal acts occurring on the landlord's premises, and of which he knows or should have known (and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining, in the particular circumstances, the reasonable measures which a landlord is under a duty to take to keep the premises safe.

*Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548, 554 (1976).

Other jurisdictions take into account notice of incidents occurring off the premises. *Isaacs v. Huntington Memorial Hospital,* 38 Cal. 3d 112, 695 P.2d 653, 211 Cal. Rptr. 356 (1985) (whether the premises are located in a high crime area); *Walkoviak v. Hilton Hotels Corp.,* 580 S.W.2d 623 (Tex. Civ. App. 1979) (whether criminal assaults occurred in close proximity to the premises).

We find that criminal activity occurring on and off the premises is relevant to establish notice since the "totality of the circumstances" is the controlling test. *See* III., *infra.*

We believe that in the area of the landlord-tenant relationship, the landlord has the duty to protect the tenant from foreseeable criminal acts of third parties.

### B.

The question then is whether a condominium owners association and its managing agent have a similar duty as a landlord to protect resident condominium owners from foreseeable criminal acts of third parties. We hold that they do.

In our view, the condominium owners association-residential condominium owner relationship is analogous to that of the landlord-tenant relationship. *See O'Connor v. Village Green Owners Ass'n,* 33 Cal. 3d 790, 662 P.2d 427, 191 Cal. Rptr. 320 (1983). *Cf. Pratt v. Maryland Farms Condominium Phase 1,* 42 Md. App. 632, 402 A.2d 105 (1979) (implicit analogy between landlord and condominium corporation in negligence action). When a condominium owners association "performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders[,]" such as managing the project, maintaining and repairing the common areas, providing security, and obtaining insurance, *O'Connor,* 33 Cal. 3d at 796, 662 P.2d at 431, 191 Cal. Rptr. at 324, the courts impose on the association the same duty of care as a landlord. *Compare Kline,* 439 F.2d at 481 (duty placed on landlord to take steps to minimize "predictable risk" to his tenants of criminal assault on the portion of the premises exclusively within his control) *with White v. Cox,* 17 Cal. App. 3d 824, 830-31, 95 Cal. Rptr. 259, 262-63 (1971) (condominium association may be sued for negligence by an association member, since the association was responsible for the common areas and the member had no effective control of the association's management body). The underlying reasoning for the imposition of the duty on the association is that it is the only one in a position to maintain and secure the common areas which are under its exclusive control. *White, supra.*

Here, the Association employed Chaney, a property management firm. Chaney's responsibilities included the inspection and maintenance of the buildings and common areas of the Project and maintenance of the Project's security. As required by Hawaii Revised Statutes § 514A-86 (Supp. 1984), the Association maintained insurance coverage for the Project. Clearly, the Association performed all the customary business

functions generally assumed by a landlord and, consequently, subjected itself to a duty of protecting resident condominium owners from foreseeable criminal acts of third parties.[9]

Chaney, in turn, is subject to the same duty imposed on the Association.[10] When a property management firm acts on behalf of and subject to the control of the condominium owners association, the firm is deemed an agent of the association. *See Ireland v. Wynkoop,* 36 Colo. App. 205, 539 P.2d 1349 (1975). As an agent in control of the premises, a property management firm is under the same duty as the association to keep the premises under its control in a safe condition. *See Bryant v. Sherm's Thunderbird Market,* 268 Or. 591, 522 P.2d 1383 (1974); *Smith v. Henger,* 148 Tex. 456, 226 S.W.2d 425 (1950); Restatement (Second) of Torts § 383 (1965).

The question left is whether the Association and Chaney owed a similar duty to the Moodys, who were not residential condominium owners, but guests of such owners. We answer yes. Since it is reasonable to anticipate that guests of residential condominium owners will be upon the Project premises, we see no reason why the same duty of care should not be extended to them. In this jurisdiction, we no longer recognize the common law status of the person on the premises—whether he is a licensee or invitee—as determinative of the duty of the owner of the premises. The crucial fact is whether that person was reasonably anticipated to be upon the premises. *Gibo v. City & County,* 51 Haw. 299, 459 P.2d 198 (1969); *Pickard v. City & County,* 51 Haw. 134, 452 P.2d 445 (1969).

In *King v. Ilikai Properties, Inc., supra,* this court held that there was no "special relationship" between the condominium owners association and the plaintiffs. Appellees claim that that holding is dispositive here. We do not agree. The facts in *King* are different from those in this case. In *King,* the assault occurred in a private condominium apartment located in a building which was operated as a hotel, the plaintiffs were a

---

[9]The Association's delegation of various responsibilities regarding the Project to Chaney does not relieve the Association of personal liability for failure to keep the premises safe. *See Mayer v. Fairlawn Jewish Center,* 38 N.J. 549, 186 A.2d 274 (1962); 62 Am. Jur. 2d *Premises Liability* § 15 (1972).

[10]Although the record is silent as to the exact legal relationship between the Association and Chaney, for purpose of the appeal, we assume the relationship to be contractual in nature.

tenant of the condominium apartment owner and the tenant's guest, and the defendants were the corporate hotel operator, the condominium owners association, and the apartment owner. Here, the plaintiffs are the condominium apartment owners and their guests and the defendants are the Association and its managing agent. Unlike *King,* here the only parties having full control of the common areas and sole responsibility for the Project security are the Association and its managing agent. A relationship of "mutual dependence," absent in *King,* is therefore evident here. *See* II.A., *supra.*

### III.

If a condominium owners association or its managing agent has knowledge of criminal activities on its project premises or in the immediate neighborhood, the association has a duty to take reasonable measures, in view of the existing circumstances, to protect residential condominium owners from criminal acts of third parties. Whether Appellees had knowledge of criminal activities and therefore whether the criminal attack on the Moodys was reasonably foreseeable by them are issues of material fact generally not subject to summary adjudication.

Appellees contend that neither of them had notice of any prior violent criminal acts on the Project premises. They claim that "[i]n the absence of prior similar violent crimes, the risk of criminal assault is pure speculation and, as a matter of law, not reasonably foreseeable." We are thus urged to adopt what has been characterized as the "prior similar incidents" rule in *Isaacs v. Huntington Memorial Hospital,* 38 Cal. 3d 112, 695 P.2d 653, 211 Cal. Rptr. 356 (1985). Jurisdictions which have adopted this rule hold that in the absence of prior similar incidents, an occupier of land is not bound to anticipate the criminal acts of third parties, especially where the assailant was a complete stranger to both the occupier and the victim and where the criminal act resulting in the injury came about precipitously. *Relyea v. State,* 385 So. 2d 1378 (Fla. App. 1980); *Rosensteil v. Lisdas,* 253 Or. 625, 456 P.2d 61 (1969); *Shipes v. Piggly Wiggly St. Andrews, Inc.,* 269 S.C. 479, 238 S.E.2d 167 (1977).

The "prior similar incidents" rule has been the subject of increased criticism because it is fatally flawed in numerous respects. These flaws were succinctly summarized by the California Supreme Court in *Isaacs v. Huntington Memorial Hosp., supra,* as follows:

First, the rule leads to results which are contrary to public policy. The rule has the effect of discouraging landowners from taking adequate measures to protect premises which they know are dangerous. This result contravenes the policy of preventing future harm. Moreover, under the rule, the first victim always loses, while subsequent victims are permitted recovery. Such a result is not only unfair, but is inimical to the important policy of compensating injured parties. Surely, a landowner should not get one free assault before he can be held liable for criminal acts which occur on his property.

Second, a rule which limits evidence of foreseeability to prior similar criminal acts leads to arbitrary results and distinctions. Under this rule, there is uncertainty as to how "similar" the prior incidents must be to satisfy the rule. The rule raises a number of other troubling questions. For example, how close in time do the prior incidents have to be? How near in location must they be? The rule invites different courts to enunciate different standards of foreseeability based on their resolution of these questions.

Third, the rule erroneously equates foreseeability of a particular act with previous occurrences of similar acts. This court has already rejected that notion. "'The mere fact that a particular kind of an accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated.' [Citation.] Thus, the fortuitous absence of prior injury does not justify relieving defendant from responsibility for the foreseeable consequences of its acts."

Finally, the "prior similar incidents" rule improperly removes too many cases from the jury's consideration. It is well established that foreseeability is ordinarily a question of fact.

*Isaacs,* 38 Cal. 3d at 125-26, 695 P.2d at 658-59, 211 Cal. Rptr. at 361-62 (citations omitted).

Based on the sound reasoning set forth in *Isaacs,* we reject the "prior similar incidents" rule as "the" basis for establishing foreseeability of criminal assault. We find no logic in a rule of law which allows an occupier of land one free assault before liability may be imposed. *See Paterson v. Deeb,* 472 So.2d 1210 (Fla. App. 1985). Evidence of prior similar incidents is not the *sine qua non* to a finding of foreseeability. *Kwaitkowski v. Superior Trading Co.,* 123 Cal. App. 3d 324, 176 Cal. Rptr. 494 (1981). *Cf. Farrior v. Payton,* 57 Haw. 620, 562 P.2d 779

(1977) (scienter of "vicious propensities" and "dangerous propensities" of a dog). While proof of prior similar incidents is probative of foreseeability, such proof is not the prerequisite, and its absence does not foreclose a finding of foreseeability. *Paterson, supra,* at 1215. Rather, the touchstone of liability is foreseeability of criminal attack based on the "totality of the circumstances." *Isaacs,* 38 Cal. 3d at 130, 695 P.2d at 661, 211 Cal. Rptr. at 364. Foreseeability must be analyzed in light of all the circumstances on a case by case approach.

> [O]ther types of evidence may also establish foreseeability, such as the nature, condition and location of the defendant's premises. . . . '[W]hat is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence.'

*Id. See also Bigbee v. Pacific Tel. & Tel. Co.,* 34 Cal. 3d 49, 665 P.2d 947, 192 Cal. Rptr. 857 (1983).

The totality of the circumstances in this case suggests not only that the question regarding the foreseeability of the assault should have been the subject of a trial but also the question regarding whether Appellees acted reasonably under the circumstances at the time of the assault:

(1) Rafael Fajardo, a Honolulu Police Department detective, states in his affidavit that "[d]uring [his] ten years of work as a detective, there has consistently been a high rate of crime in the Kalihi area, with particular reference to the crimes of burglary, theft and assault. . . . The heaviest saturation of crime . . . is in the immediate vicinity of Kuhio Park Terrace . . . which includes the project."

(2) Roy Wayne Cook, Sr., an alleged expert by experience and education in the matter of security measures, states in his affidavit that in his opinion, based upon his knowledge, training and expertise, the locking system employed at the complex "was not an adequate security locking system for use in residential units."

(3) The deposition testimony of Al Kort, Appellees' representative, discloses that the security guard was to make his rounds by walking through the floors of the Project's two buildings and the perimeter of the Project every forty minutes. During the time of the assault, the guard should have passed by the Dukesherers' apartment "at least" twice. On the night of the assault the guard failed to complete his nightly report because he was in a "hurry to get home." The guard's whereabouts at the time of the assault are in dispute.

(4) Louise Savea, resident manager, testified at her deposition that on a night prior to the assault on the Moodys one guard was caught

sleeping on duty.

(5) Sesera Selu, the guard on duty, testified when deposed that on the night of the assault he heard a loud noise in the nature of a gun shot or hammer sound. However, contrary to training instructions, he failed to go inside the building to investigate the origin of the noise.

(6) A President's Report, the annual report of the Board of Directors, states, "[t]here were cases of unsolved rape, robbery and break-in in this project. *All of these related to security problems.*" (Emphasis added.)

(7) The evidence in the record further indicates the occurrence of a prior burglary on the premises, acts of vandalism, repeated attempts by unknown parties to keep fire escape doors open,[11] and rumors of a master key floating around.

We believe that based on the totality of these circumstances, the trial court erred in granting summary judgment. "[J]ust as we may not rely upon our private judgment on this issue, so the trial court may not impose its private judgment upon a situation, such as this, in which reasonable minds may differ." *Schwartz v. Helms Bakery Limited,* 67 Cal. 2d 232, 244, 430 P.2d 68, 76, 60 Cal. Rptr. 510, 518 (1967).

We are reluctant to have questions of foreseeability resolved by summary judgment when an intervening act is involved. *See McKenna v. Volkswagenwerk,* 57 Haw. 460, 558 P.2d 1018 (1977); *Leary v. Poole,* 5 Haw. App. 596, 705 P.2d 62 (1985). Foreseeability "may be decided as a question of law only if, 'under the undisputed facts there is no room for a reasonable difference of opinion.'" *Isaacs,* 38 Cal. 3d at 126, 695 P.2d at 659, 211 Cal. Rptr. at 362. We believe that the evidence in this case, when viewed in a light most favorable to the Appellants, is sufficient to raise genuine issues of material fact as to (1) whether the assault was foreseeable, and (2) whether Appellees, at the time of the assault, provided security in accordance with the standards required of a reasonable and prudent person under the same or similar circumstances. *See Gomez v. Ticor,* 145 Cal. App. 3d 622, 193 Cal. Rptr. 600 (1983); *Walkoviak v. Hilton Hotels Corp.,* 580 S.W.2d 623 (Tex. Civ. App. 1979). Such issues are to be resolved by the trier of fact, and are not proper issues to be determined as a matter of law in a summary judgment proceeding.

---

[11] The record indicates that the resident condominium owners had keys to these doors.

We reverse the summary judgment and remand the case for trial.

*Nathan J. Sult (David L. Turk* with him on the brief; *David L. Turk, Attorney at Law, A Law Corporation,* of counsel) for plaintiffs-appellants.

*Walter Davis (Archibald C. K. Kaolulo* with him on the brief; *Davis, Reid & Richards,* of counsel) for defendants-appellees Association of Apartment Owners of 1260 Richard Lane and Aaron M. Chaney, Inc.

### CONCURRING OPINION OF BURNS, C.J.

I agree with the majority that it was error to enter summary judgment in favor of the Association and Chaney against the plaintiffs. The Association employed a security guard on Mondays through Fridays from 11:30 p.m. to 7:30 the next morning and on Saturdays and Sundays from 4:00 p.m. to 8:00 the next morning. There is evidence that during the early morning hours of Sunday, May 20, 1979, its security guard was negligent. Having undertaken at the apartment owners' expense to provide the security service, the Association is liable if it performed negligently and its negligence was a substantial factor cause[1] of damage to the Moodys.

I disagree with the majority's interpretation of the *King v. Ilikai Properties, Inc.* case. In my view, the majority's opinion reverses this court's holding in that case. *See Wolsk v. State,* 68 Haw. 302, 711 P.2d 1300 (1986).

In *King,* all of the more than 1,000 apartments in the Ilikai's Tower Building were condominium apartments. Many of the apartment owners leased their apartments to Ilikai Properties, Inc. (IPI), who rented them to its customers as hotel rooms. Others, such as Shigeta, leased them to tenants, such as King. Others resided in them.

Thus, the only relevant difference between IPI and King was that IPI leased many apartments to rent to its customers as hotel rooms and King leased only one apartment for her own occupancy. Whatever security services IPI provided was as innkeeper to its hotel guests. IPI did not have any more responsibility for the security of non-hotel guests than did Shigeta or the other owners or lessees of the apartments not leased to

---

[1]*See McKenna v. Volkswagenwerk Aktiengesellschaft,* 57 Haw. 460, 558 P.2d 1018 (1977).

IPI.

This court held that neither Shigeta nor the Ilikai Association of Owners nor IPI owed any legal duty to King and her guest, Kelley, to protect them in King's apartment from the foreseeable criminal acts of third parties. If, as the majority holds in this case, a landlord owes such a duty to his tenant and his tenant's guests, then Shigeta owed such a duty to King and Kelley. If all condominium associations owe such a duty to the owners and lessees of the condominium apartments and their guests, then the Ilikai Association of Owners owed such a duty to Shigeta, King, and Kelley.

I also disagree that all condominium associations have a legal duty to protect their apartment owners and persons reasonably anticipated to be on the premises from the harm caused on the premises by the foreseeable[2] criminal acts of third persons.[3]

The Dukesherers are the owners of Hale Kekoa condominium apartment A506. The Hale Kekoa condominium consists of two buildings. The makai or "A" building has five floors of apartments and 50 apartments. The mauka or "B" building has six floors of apartments and 114 apartments. The Dukesherers are also the owners of a .6% undivided interest in the Hale Kekoa's common elements which includes its limited common elements which includes one parking space per apartment.

The affairs of the Association are governed by a nine-member Board of Directors (Board). Three are elected each year for three-year terms. When voting for Board members, each apartment owner votes the amount of his, her, or its percentage interest in the Hale Kekoa's common elements.

According to the Hale Kekoa's By-Laws, the Board is responsible, *inter alia,* for the "[o]peration, care, upkeep and maintenance of the common elements." Nothing in Hawaii Revised Statutes chapter 514 (Hawaii's Horizontal Property Regime law) or in the Hale Kekoa condominium documents obligates the Association to provide security devices or services for the benefit of its apartment owners.

In my view, the majority's decision imposes a legal duty which ought not be imposed except by the parties involved or by the legislature.

---

[2]In this day and age when no one and no place is safe from the criminal acts of third persons, we may expect the foreseeability issue to be decided against the associations.

[3]I express no opinion on the same question with respect to landlords and tenants.

There is scant evidence that condominium apartment owners and persons reasonably anticipated to be on the premises want or need such judicial intervention.[4] In my opinion, the imposition of the legal duty imposed by the majority's decision is not in the public interest.[5]

The only way condominium associations can realistically protect themselves against the liability of this duty is by installing state of the art security devices and improvements, employing reliable security personnel and services, and buying insurance. In my view, the majority's decision erroneously imposes these requirements on condominium buyers and owners who do not want or need the bother, the intrusiveness, or the additional expense that such devices, improvements, personnel, services, and insurance will cause them, their lessees, and their guests

---

[4]When persons consider buying a condominium apartment, they can easily determine what kind, if any, of security devices, services, and improvements are needed and provided. If they are dissatisfied with the existing situation, they should not make the purchase. If after they purchase they think more or better devices, services, and improvements are necessary, then as voting members of the association they can attempt to convince the association's other voting members and board to have them provided. The cost of those items will be directly and immediately passed on to them and the other apartment owners in the form of special assessments or regular maintenance fees. They can also install additional security devices in their own apartment at their own expense.

[5]Logically, if all condominium associations have a legal duty to protect their apartment owners and persons reasonably anticipated to be on the premises from the harm caused on the premises by the foreseeable criminal (and noncriminal) acts of third persons, then architects and developers have a correlative duty to design and develop all condominium developments to facilitate associations in the fulfillment of their duty.